UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

     Plaintiff,

v.                                  Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

     Defendant.

_____/


**DEFENDANT BAHATTAB'S REPLY MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

ARGUMENT ............................................................................................................................ 6

I.    Dr. Bahattab has Satisfied the Standard to Dismiss Juniper's Claims of Inequitable Conduct on Summary Judgment ..................................................................................... 6

II.    Juniper has not, and Cannot, Demonstrate That There is a Triable Issue on its Inequitable Conduct Claim. ........................................................................................... 7

      A.    Dr. Bahattab Actually Disclosed the ASTC Article Listing the Co-authors. ....... 10

      B.    The Existence of Co-authors is Not Material to the Patentability of the '457 Patent.................................................................................................................... 12

      C.    There was No Intent to Deceive the Patent Office because the Article and its Co-authors were Disclosed. ..................................................................................... 15

III.    Juniper's Pleading of Inequitable Conduct is Insufficient ................................................. 16

IV.    Juniper Fails to Satisfy the Requirements for a Rule 56(f) Delay. .................................... 18

      A.    Co-authorship cannot, as a Matter of Law, Provide an Inference of Co-inventorship.................................................................................................................. 19

      B.    The Declarations of Dr. Bahattab and his Advisors Provide Conclusive Evidence that Dr. Bahattab is the Sole Inventor of the Invention Disclosed in the '457 patent................................................................................................................... 20

CONCLUSION......................................................................................................................... 23

CERTIFICATE OF SERVICE ................................................................................................. 24

SERVICE LIST ........................................................................................................................ 25

TABLE OF AUTHORITIES

CASES

*Abbot Labs. v. TorPharm, Inc.*, 300 F.3d 1367 (Fed. Cir. 2002)................................................... 8

*Advanced Respiratory, Inc. v. Electromed, Inc.*, No. Civ. 00-2646 (DWF/SRN), 2002 WL
    31386740 (D. Minn. Oct. 22, 2002). ...................................................................................... 14

*Am. Dental Ass'n Health Found. v. Bisco Inc.*, 1992 WL 137611, 24 U.S.P.Q.2d 1524 (N.D. Ill.
    1992).......................................................................................................................................... 9

*Amgen Inc. v. Hoecht Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003) .............................. 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).................................................. 6, 7, 10, 20

*Ass'n of Am. Med. Colleges. v. Princeton Review, Inc.*, 332 F.Supp.2d 11 (D.D.C. 2004).......... 16

*AT & T Corp. v. Microsoft Corp.*, No. 01 civ 4872 WHP, 2004 WL 232725 (S.D.N.Y. Feb. 9,
    2004).................................................................................................................... 6, 8, 9, 15, 16

*ATD Corp. v. Lydall, Inc.*, 159 F.3d 534 (Fed. Cir. 1998)........................................................ 7, 8

*Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321 (Fed. Cir. 1998) ................................................ 8

*Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1415 (D.C. Cir. 1995) ................................................ 18

*Blackhawk Molding, Co. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948 (N.D. Ill. 2006) ....... 15

*Braun Inc. v Dynamics Corp. of Am.*, 975 F.2d 815 (Fed. Cir. 1992) ........................................... 9

*Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp. 2d 522 (D.N.J. 2000) ................. 8, 11

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998).................................................. 9

*Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231 (D.C. Cir. 1999)................................... 18

*Digital Control, Inc. v. Charles Mach. Works,* 437 F.3d 1309 (Fed. Cir. 2006)........................... 8

*Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998)......................................... 20

*Ex parte Kroger & Rod*, 219 U.S.P.Q. 370 (B.P.A.I. 1982) ........................................................ 14

*Ex parte Raikhel*, 1996 WL 1771220 (B.P.A.I. 1996) ........................................................... 14, 19

*Ex parte Seaborg*, 1961 WL 7840, 131 U.S.P.Q. 202 (B.P.A.I. 1960) ..................... 12, 13, 17, 20

*Exxon Corp. v FTC*, 663 F.2d 120 (D.C. Cir. 1980) .................................................................. 18

*Grantley Patent Holdings, Ltd. v. Clear Channel Commc'ns, Inc.*, 540 F. Supp. 2d 724 (E.D.

   Tex. 2008) ...................................................................................... 7, 8, 11, 12, 15

*Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435 (Fed. Cir. 1991)...................... 9, 16

*Hunter v. Rice*, 480 F.Supp.2d 125 (D.D.C. 2007) .......................................................... 6

*In re Katz*, 687 F.2d 450 (C.C.P.A. 1982) ........................................... 12, 13, 14, 19, 20

*Intex Recreation Corp. v. Team Worldwide Corp.*, 390 F. Supp. 2d 21 (D.D.C. 2005) .............. 16

*MacPherson v. Searle & Co.*, 775 F. Supp. 417 (D.D.C. 1991) ................................................ 7, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................... 6

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365 (Fed. Cir. 2001) ................... 8, 15

*Monsanto Co. v. Bayer Bioscience N.V.,* 514 F.3d 1229 (Fed. Cir. 2008) .................................... 8

*Montgomery v. Ruxton Health Care, IX, LLC*, No. 3:06cv024, 2006 WL 3746145 (E.D. Va. Dec.

   15, 2006)............................................................................................................... 13

*Omega Cable & Comm., Inc. v. Time Warner, Inc.*, Slip Copy, No. 5:05CV1780, 2008 WL

   163613 (N.D. Ohio Jan. 16, 2008) ........................................................................ 11

*Ortho Pharm. Corp. v. Smith*, No. 90-0242, 1990 WL 121353, 18 U.S.P.Q.2d 1977 (E.D. Pa.

   1990), *aff'd*, 959 F.2d 936 (Fed. Cir. 1992)............................................................. 18

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475-76 (6th Cir. 2002) ............................................ 13

*Stern v. Trustees of Columbia Univ.*, No. 01CIV10086RCC, 2005 WL 398495 (S.D.N.Y. Feb.

   18, 2005)............................................................................................................... 12

*Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859 (D.C. Cir. 1989) ......... 18, 21

*Takeda Pharm. Co., Ltd. v. Dudas,* 511 F. Supp. 2d 81 (D.D.C. 2007) .............................. 6, 7, 20

*TALtech Ltd. v. Esquel Apparel, Inc.*, No. 2007-1506 (Fed. Cir. May 22, 2008)

   (nonprecedential) ................................................................................................................. 8

*U.S. ex rel. Fisher v. Network Software Assocs.*, 227 F.R.D. 4, 8 (D.D.C. 2005) ........................ 18

*Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139 (Fed. Cir. 2003) ................ 9, 15

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684 (Fed. Cir. 2001) ................. 9, 15

*Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298 (Fed. Cir. 2003) ............... 7

## STATUTES

28 U.S.C. § 1746 ................................................................................................................... 13

## RULES

37 C.F.R. § 1.56 ...................................................................................................................... 8

Fed. R. Civ. P. 56(e)(2) .......................................................................................................... 6

Fed. R. Civ. P. 9(b) ............................................................................................................... 17

PRELIMINARY STATEMENT

Defendant, Abdullah Ali Bahattab ("Dr. Bahattab"), by and through his undersigned counsel, submits this reply memorandum in support of his motion for partial summary judgment as to part of Count I and all of Count II of the Complaint filed by Juniper Networks, Inc. ("Juniper") on October 3, 2007.

Juniper filed this action because a Saudi Arabian computer scientist, Dr. Bahattab, had the audacity to sue Juniper in the courts of Dubai for infringement of his United States Patent, and because the Dubai courts had the temerity to exercise jurisdiction over the suit. Juniper was not content to seek a declaration in this Court that it was not infringing Dr. Bahattab's patent. Instead, Juniper resorted to the widely condemned practice of alleging that Dr. Bahattab engaged in inequitable conduct before the Patent Office by failing to disclose three other purported inventors of his technology.

Dr. Bahattab communicated with Juniper in January of 2005 and asserted that Juniper was infringing on his U.S. Patent. Compl. ¶ 9. Dr. Bahattab then sued Juniper in the courts of Dubai for patent infringement in April of 2007. Compl. ¶ 10. Juniper did not file suit in this Court against Dr. Bahattab until six months after the Dubai suit was filed, and more than two years after Dr. Bahattab claimed that Juniper was infringing his U.S. Patent. Despite ample time to do so, Juniper conducted virtually no pre-suit investigation of its belated and unsupported allegation that Dr. Bahattab misled the U.S. Patent Office (the "Patent Office") by not disclosing the existence of three other alleged inventors who happened to be listed on a publication describing the technology behind Dr. Bahattab's patent.

Juniper is now confronted with irrefutable evidence from the co-authors and alleged co-inventors that Dr. Bahattab is the sole inventor of the technology in his U.S. Patent. Each of the

co-authors, Drs. Bodnar, Evens, and Kraft, has unequivocally declared that he or she is not an inventor of the technology in Dr. Bahattab's patent. Each co-author was merely a thesis advisor for Dr. Bahattab, and their only role in the publication of the articles related to Dr. Bahattab's thesis was that of editor and advisor.

The only opposition that Juniper can now muster to this evidence is that the published articles used the terms "we" and "us" to refer to those who participated in the work described in the articles. Juniper fails to acknowledge, however, that such evidence, standing alone, does not create a question of fact as to whether a co-author may also be deemed to be a co-inventor of a patent. Moreover, one of the alleged co-inventors, Dr. Evens, has unequivocally stated that Dr. Bahattab originally drafted his thesis using the terms "I," "me," "my" and "mine," but that she recommended that he change to the plural forms of these pronouns because it is the customary style for dissertations and engineering papers.

Juniper impliedly recognizes that its evidence is insufficient to create a question of fact, so it now asks this Court to allow it to conduct the investigation it should have conducted before filing suit. Juniper's effort once again fails, however. Juniper has not offered any basis upon which this Court may conclude that the facts to be discovered would provide any evidence that would create a triable fact, nor why it cannot produce those facts in opposition to the pending motion for summary judgment. The most Juniper can offer is that if this Court allows depositions of Drs. Bahattab, Bodnar, Evens, and Kraft, Juniper might discover some unspecified evidence that could be used to contradict the unequivocal testimony that Dr. Bahattab is the sole inventor of his U.S. Patent. Juniper's failure to conduct a pre-suit investigation that would have deterred the filing of its inequitable conduct claims should not be rewarded by allowing it to

delay the inevitable adverse judgment and increase Dr. Bahattab's costs and the continuing harm to his reputation.

Juniper has offered no competent evidence of a dispute of a material fact. Dr. Bahattab is the sole inventor of his U.S. Patent No. 6,816,457 ("the '457 patent"), and no amount of discovery will change that fact. Summary judgment is warranted.

## STATEMENT OF FACTS

In 1999, Dr. Bahattab was a doctoral candidate in computer science at the Illinois Institute of Technology in Chicago. Exh. 3, Declaration of Abdullah Ali Bahattab, ¶ 5, (hereafter "Bahattab Decl. ¶ _"). Dr. Bahattab's thesis committee consisted of his advisors Dr. Bohan Bodnar, then an employee at Lucent Technologies, Dr. Martha Evens, a Research Professor of Computer Science at the Department of Computer Sciences at the Illinois Institute of Technology, and Dr. Robert Kraft, an Associate Professor of Information Systems for the Illinois Institute of Technology Stuart Graduate School of Business. Exh. 3, Bahattab Decl. ¶ 4. Dr. Bodnar was Dr. Bahattab's lead technical thesis advisor for the thesis committee. Near the end of 1999, Dr. Bodnar deemed Dr. Bahattab's research to be fundamentally completed, and he recommended that Dr. Bahattab terminate his research and document it in a thesis and conference paper. Exh. 2, Supplemental Declaration of Bohdan Bodnar, ¶ 7 (hereafter "Bodnar Supp. Decl. ¶ _").

Dr. Bodnar was one of the founders of the Advanced Simulation Technologies Conference ("AST Conference"). Scientific papers were presented at these conferences. For a paper to be published at the AST Conference, the work represented in the paper had to be novel, not published elsewhere, directly applicable to industry telecom-related issues, accessible to the general audience, and the majority of the reviewers had to accept it for publication. Exh. 2,

Bodnar Supp. Decl. ¶ 8.  Dr. Bahattab submitted a condensed version of his thesis for publication presentation at the April 16-20, 2000 AST Conference (hereinafter "ASTC article").  Exh. 2, Bodnar Supp. Decl. ¶¶ 9-10.  The paper was entitled "Predicting IP addresses to speed up routing lookup."  *Id.* ¶ 10.

Drs. Bodnar, Evens and Kraft appeared as co-authors on the ASTC article.  They were added by Dr. Bahattab as a courtesy because they served as his thesis advisors, and provided editorial, proof reading, and administrative assistance.  In departments of Computer Science it is a common practice to include thesis advisors as authors on thesis publications.  Dr. Bodnar suggested a rewriting of the introduction to make the material more accessible to a general audience, and to ensure the paper was critiqued by the appropriate reviewers.  Dr. Evens advised Dr. Bahattab to use the editorial "we" in his thesis and in his scientific papers.  Whenever Dr. Evens found an "I," "me," or "mine," she advised Dr. Bahattab to change these singular pronouns to the plural "we," "us," "our," and "ours."  This is also a common practice.  *See* Exh. 5, Declaration of Martha Evens, ¶ 7 (hereafter "Evens Decl. ¶ _"); Exh. 8, Supplemental Declaration of Martha Evens, ¶¶ 5-6 (hereafter "Evens Supp. Decl., ¶ _"); Exh. 4, Declaration of Bohdan Bodnar, ¶¶ 8-10 (hereafter "Bodnar Decl. ¶ _"); Exh. 2, Bodnar Supp. Decl. ¶¶ 5, 10; Exh. 6, Declaration of George Kraft, ¶ 8, (hereafter "Kraft Decl. ¶ _").  Dr. Bodnar was listed as the first author solely to comply with Lucent's requirement that Lucent co-authors be listed first on papers published with non-Lucent personnel.[1]  Exh. 2, Bodnar Supp. Decl. ¶ 10.  The position of Dr. Bodnar's name has no significance beyond that.  Exh. 3, Bahattab Decl. ¶ 10.

---

[1] Dr. Bodnar also explains that he had left Lucent by the time that the article entitled "Producing a High Hit Ratio and Low Search Time in Forwarding Routing Tables by Predicting IP

4

The methodology developed by Dr. Bahattab that was reported in his thesis and presented at the AST Conference and other conferences was the original and independent work of Dr. Bahattab.  In the opinions of his thesis advisors, Dr. Bahattab's work was novel, original, and innovative.  Exh. 4, Bodnar Decl. ¶¶ 6-7; Exh. 2, Bodnar Supp. Decl. ¶ 9; Exh. 5, Evens Decl. ¶¶ 6-7; Exh. 8, Evens Supp. Decl. ¶ 6; Exh. 6, Kraft Decl. ¶ 7.

Two months later, on June 20, 2000, Dr. Bahattab filed his Provisional Patent Application No. 60/208,888 with the PTO (the Provisional Application).  *See* Mot. For Summary Judgment Exh. 1.   The Provisional Application was Dr. Bahattab's thesis at that time and was entitled "Predictive Router Line Card Cache Population."  Exh. 3, Bahattab Decl. ¶ 12.  The text of the thesis contained plural pronouns throughout as is customary and as recommended by Dr. Evens.  Exh. 8, Evens Supp. Decl. ¶ 5.  Dr. Bahattab disclosed and discussed the ASTC article in the Provisional Application, both in the body of the text and in the bibliography, and also listed all of the article's co-authors.  *See* Mot. For Summary Judgment Exh. 1, Provisional Application pages 110 of 127 and 123 of 127.

On August 7, 2000, Dr. Bahattab submitted his non-provisional Patent Application No. 09/633754 to the Patent Office, which resulted in the grant of U.S. Patent No. 6,816,457 on December 9, 2004.  Mot. For Summary Judgment Exh. 2.  The invention in the Patent Application was entitled "Predictive Routing Table Cache Population."  Dr. Bahattab expressly made reference to the Provisional Application in the first sentence of the Patent Application Specification following the title as required by 37 C.F.R. § 1.78(b)(3).  In the Declaration and

Addresses" appeared in 2002 in an IEEE publication.  Bodnar Supp. Decl. ¶ 12.  He states his belief that "Dr. Bahattab added that footnote [to the IEEE article] for clarification."  *Id.*

Power of Attorney submitted by Dr. Bahattab with the Patent Application, Dr. Bahattab declared that he is the first and sole inventor of the subject matter which was claimed and for which a patent was sought, and he expressly claimed the benefit of the Provisional Application. See Exh. 1, U.S. PTO File Wrapper, U.S. Patent No. 6,816,457, p. 25 (hereafter "Exh. 1, '457 file wrapper, p. _").

ARGUMENT

I.    Dr. Bahattab has Satisfied the Standard to Dismiss Juniper's Claims of Inequitable Conduct on Summary Judgment

When the moving party has met its burden to demonstrate that there is no genuine issue of material fact, as Dr. Bahattab has done here, the burden shifts and the nonmoving party cannot rest merely on its allegations or on denials. *Takeda Pharm. Co., Ltd. v. Dudas,* 511 F. Supp. 2d 81, 86 (D.D.C. 2007). The opposing party must provide specific facts demonstrating that there is a genuine issue of material fact for trial to overcome summary judgment. Fed. R. Civ. P. 56(e)(2); *Takeda,* 511 F. Supp. 2d at 86. A non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *AT & T Corp. v. Microsoft Corp.*, No. 01 civ 4872 WHP, 2004 WL 232725, at *2 (S.D.N.Y. Feb. 9, 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party is required to put forward affirmative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Hunter v. Rice*, 480 F.Supp.2d 125, 129 (D.D.C. 2007) (Friedman, J.). If the evidence is simply

6

colorable or is not appreciably probative, summary judgment may be granted. *MacPherson v. Searle & Co.*, 775 F. Supp. 417, 420-21 (D.D.C. 1991). The opposing party meets its burden only if a reasonable jury could return a verdict for that party. *Takeda,* 511 F. Supp. 2d at 86. Furthermore, issues of patent inventorship are questions of law, subject to *de novo* review. *See Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1304-05 (Fed. Cir. 2003).

Although inequitable conduct requires a finding based on all the evidence, "summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant cannot prevail," *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998), and the moving party has demonstrated "to the court an absence of evidence to support an essential element of the claims." *Grantley Patent Holdings, Ltd. v. Clear Channel Commc'ns, Inc.*, 540 F. Supp. 2d 724, 729 (E.D. Tex. 2008). If a party fails to meet its burden of proof to show that there is a genuine issue of material fact regarding inequitable conduct, "summary judgment is mandatory". *Id* (emphasis added). The proper question for this summary judgment is whether or not the evidence in the record could support a reasonable finding of inequitable conduct by clear and convincing evidence. *See Anderson*, 477 U.S. at 255-56. It cannot, and summary judgment should be granted.

II.     Juniper has not, and Cannot, Demonstrate That There is a Triable Issue on its Inequitable Conduct Claim.

Juniper cannot offer any competent evidence to support its claims of inequitable conduct and thus cannot avoid summary judgment on this issue. Juniper must prove that there was a failure to disclose material information to the U.S. Patent Office and that this failure to disclose was intended to deceive or mislead the examiner into granting the patent to establish inequitable

conduct.  *ATD Corp.,* 159 F.3d at 546.    The burden on Juniper is to establish materiality and

intent to deceive by clear and convincing evidence.  *Abbot Labs. v. TorPharm, Inc.*, 300 F.3d

1367, 1379 (Fed. Cir. 2002); *see AT & T*, 2004 WL 232725, at *6 (stating that the burden is on

the party alleging inequitable conduct to prove deceptive intent and *not* on the opposing party to

prove good faith.)

Information is material if there is "a substantial likelihood that a reasonable examiner

would consider it important in deciding whether to allow the application to issue as a patent."

*AT & T*, 2004 WL 232725, at *3, (quoting *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321,

1327 (Fed. Cir. 1998)). [2]  The Federal Circuit has defined information as "material if it helps to

establish a prima facie case of unpatentability *or* if it refutes or is inconsistent with the

applicant's positions before the PTO."  *Bristol-Myers Squibb Co. v. Ben Venue Labs.*, 90 F.

Supp. 2d 522, 529 (D.N.J. 2000).  However, information is only material if it is "not cumulative

to information already of record or being made of record in the application."  37 C.F.R. § 1.56;

*Monsanto Co. v. Bayer Bioscience N.V.,* 514 F.3d 1229, 1237 (Fed. Cir. 2008); *Grantley*, 540 F.

Supp. 2d at 731; *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1378 (Fed. Cir.

2001) (holding that if a document is simply cumulative of the references already before the

examiner it is not material).  "If the material is cumulative to other disclosed material, as a matter

of law, the inventor is not obligated to disclose it."  *TALtech Ltd. v. Esquel Apparel, Inc.*, No.

2007-1506, slip op. at 5 (Fed. Cir. May 22, 2008) (nonprecedential) (emphasis added).

---

[2]  The Patent Office's new materiality standard under 37 C.F.R. § 1.56, as amended in 1992, is
essentially the same as the "reasonable examiner" standard.  *Digital Control, Inc. v. Charles
Mach. Works,* 437 F.3d 1309, 1316 (Fed. Cir. 2006).

Materiality alone does not presume intent. *Braun Inc. v Dynamics Corp. of Am.*, 975 F.2d 815, 822 (Fed. Cir. 1992). "Further, a mere showing that references having some degree of materiality were not disclosed does not establish inequitable conduct." *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1442 (Fed. Cir. 1991). There must be a factual foundation for a determination of deceptive intent. *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 694 (Fed. Cir. 2001). A negligent failure to disclose a reference supports an inference of deceptive intent only when, viewed in light of the entirety of the evidence, including good faith evidence, the failure is culpable enough to require a finding of deceptive intent. *Halliburton*, 925 F.2d at 1443. Negligence and even gross negligence are unacceptable to prove deceptive intent. *See Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1145-46 (Fed. Cir. 2003). Furthermore, "[d]eceptive intent is not inferred simply because information was in existence that was not presented to the examiner . . ." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998). *See also Am. Dental Ass'n Health Found. v. Bisco Inc.*, 1992 WL 137611, 24 USPQ2d 1524, 1529 (N.D. Ill. 1992) ("To the dismay of many courts, litigants have not hesitated to invoke [37 C.F.R.] section 1.56, notwithstanding its rather strict intent requirement."). Alleging inequitable conduct in patent litigation has long been discouraged by the Federal Circuit. *AT & T,* 2004 WL 232725, at *4.

After these materiality and intent threshold findings have been established by clear and convincing evidence, the court must weigh them to ascertain if equity requires finding the patent unenforceable. *Ulead,* 351 F.3d at 1144. A court cannot find "inequitable conduct on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO." *Amgen Inc. v. Hoecht Marion Roussel, Inc.*, 314 F.3d 1313, 1358 (Fed. Cir. 2003) (citation omitted.)

9

The record here is insufficient to prove materiality and completely devoid of any evidence of intent to deceive the Patent Office. As such, Juniper does not, and cannot, as a matter of law, offer competent evidence to avoid summary judgment on its inequitable conduct claims.

A. Dr. Bahattab Actually Disclosed the ASTC Article Listing the Co-authors.

Juniper alleges that the failure to name the co-authors of the ASTC article as co-inventors of the '457 patent was material and done with the intent to deceive the Patent Office. Juniper cannot prove by clear and convincing evidence that the alleged failure to disclose the co-authors was material or that it was withheld from the Patent Office with deceptive intent because the record clearly shows that the article was disclosed to the Patent Office by Dr. Bahattab.[3] The ASTC article was first listed in the bibliography of his provisional patent application, and cited at the particular point in the application where the choice of the auto-regressive moving average was discussed. *See* Mot. For Summary Judgment Exh. 1, Provisional Application p. 110 of 127. Then, in accordance with 37 C.F.R 1.57 and 1.78, the provisional patent application was incorporated by reference in the first sentence of the patent specification, under the section entitled "Cross-Reference to the Related Applications." Exh. 1, '457 file wrapper, p. 11; '457 patent at col. 1.

This incorporation by reference precludes a finding of materiality because the article is cumulative of the provisional application and the patent application and precludes a finding of

---

[3] While "clear and convincing evidence" is not the naked summary judgment standard, "the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

intent to deceive because there was no failure to disclose by Dr. Bahattab.  The ASTC article is simply a condensed version of Dr. Bahattab's thesis, which was submitted as his provisional patent application and contains nothing that is not disclosed within the provisional patent application itself.  *See* Exh. 2, Bodnar Supp. Decl. ¶ 9; [4] *see also Bristol-Myers Squibb*, 90 F. Supp. 2d at 527 (holding that withholding a reference which described fundamentally the same material that was described in disclosed material could not support a finding of inequitable conduct.)  The fact that Dr. Bahattab included the ASTC article in the bibliography of his provisional patent application and then incorporated the provisional application by reference in his utility patent application is incompatible with any intent to deceive.  *See Grantley*, 540 F. Supp. 2d at 732 (holding that incorporation by reference in the patent specification of an allegedly concealed publication was inconsistent with any intent to deceive by the applicant.)  The fact that Dr. Bahattab failed to provide a copy of the article is not evidence of a failure to disclose or any intent to deceive, where, as here, the reference was identified and cited in the patent application.  Juniper has failed to prove, or even allege any facts to support, its allegation that Dr. Bahattab failed to disclose material information to the Patent Office and therefore summary judgment should be granted.

---

[4] Affidavits submitted with a reply are allowed where the "affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the party new reasons for the entry of summary judgment."  *Omega Cable & Comm., Inc. v. Time Warner, Inc.*, Slip Copy, No. 5:05CV1780, 2008 WL 163613 (N.D. Ohio Jan. 16, 2008).

B.  The Existence of Co-authors is Not Material to the Patentability of the '457
Patent.

Issuance of a patent "creates a presumption that the named inventors are the 'true and only inventors.'"  *Grantley*, 540 F. Supp. 2d at 733 (citation omitted); *Stern v. Trustees of Columbia Univ.*, No. 01CIV10086RCC, 2005 WL 398495, at *6 (S.D.N.Y. Feb. 18, 2005). "[A]uthorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article." *In re Katz*, 687 F.2d 450, 455 (C.C.P.A. 1982)*; see Ex parte Seaborg*, 1961 WL 7840, 131 U.S.P.Q. 202, 203 (B.P.A.I. 1960) ("the bare fact that [someone] is the literary co-author is not evidence of joint inventorship.").  Both the courts and the Patent Office have held that authorship alone is not evidence of inventorship.  *Katz*, 687 F.2d at 455; *Seaborg*, 1961 WL 7840, 131 U.S.P.Q. at 203.  Publication of an article does not prove that someone made an invention.  *Katz*, 687 F.2d at 454.  If the article itself does not delineate that the subject matter is the sole work of the inventor then additional evidence *may* be submitted, but is not required.  *Katz,* 687 F.2d at 455.

Dr. Bahattab executed a Declaration and Power of Attorney that was submitted with his patent application, stating that he is "the original, sole and first inventor of the subject matter which is claimed…"  Exh. 1, '457 file wrapper, p. 25.  This declaration alone is sufficient to prove that Dr. Bahattab is the sole inventor of the '457 patent.  However, Dr. Bahattab has executed a new Declaration that again asserts that his is the sole inventor of the invention disclosed in the '457 patent and describing the role of his advisors in the development of his thesis paper.  Exh. 3, Bahattab Decl. ¶ 8.  Additionally, each of Dr. Bahattab's thesis advisors have executed declarations stating unequivocally that they are not co-inventors and describing

their role as advisors to Dr. Bahattab's thesis.  *See* Exh. 4, Bodnar Decl. ¶ 13, Exh. 5, Evens Decl. ¶ 12, and Exh. 6, Kraft Decl. ¶ 12.[5] [6]

In *Katz,* when the inventor resubmitted a declaration stating that the co-authors were students of the inventor, the court held that this declaration was significant because it provided a "clear alternative conclusion to the board's inference that their names were on the article because they were co-inventors."  *Katz*, 687 F.2d at 455; *see Seaborg*, 1961 WL 7840, 131 U.S.P.Q. at 203 (the co-author submitted an affidavit stating that he was not an inventor of the subject matter of the patent and the Board held that without any "adversity of interest there seems to be little basis for challenging the affidavit").  The *Katz* court held joint inventorship should not be inferred from co-authorship.  687 F.2d at 456.  The relationship between Dr. Bahattab and his advisors, as made clear through the declarations, is analogous to the student/teacher relationship in *Katz*, and as such inventorship cannot be inferred.  Such declarations, unless challenged by other evidence of record, are presumed conclusive before the Patent Office. *Compare Katz*, 687

---

[5] Juniper asserts that Dr. Evens and Dr. Bodnar's declarations should not be admitted because they were not dated.  Undated declarations may be admitted as evidence if the extrinsic evidence reveals the approximate time period in which they were signed.  *Montgomery v. Ruxton Health Care, IX, LLC*, No. 3:06cv024, 2006 WL 3746145, at *3 (E.D. Va. Dec. 15, 2006).  This estimated time period satisfies the date requirement of 28 U.S.C. § 1746.  *Montgomery*, 2006 WL 3746145, at *3; *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475-76 (6th Cir. 2002) (holding that the lack of a date on declarations does not cause them to be inadmissible if the time period when the declarations were signed can be estimated.)  The extrinsic evidence here satisfies those requirements.  *See* **Exh.** 7, Decl. of Courtney G. Meade.  In any event, dated, declarations of Dr. Bodnar and Dr. Evens have now been submitted.

[6] Juniper repeatedly characterizes the declarations of Drs. Bodnar, Evens, and Kraft as "conclusory." It should be noted that these declarations are declarations of fact, necessarily requiring conclusive statements of fact, to be contrasted with opinionative declarations of experts.

F.2d at 455 *with Ex parte Kroger & Rod*, 219 U.S.P.Q. 370, 372 (B.P.A.I. 1982) (requiring additional evidence where one alleged co-inventor refused to sign a declaration disclaiming any co-inventorship).   Here, the alleged co-inventors to the '457 patent have each provided declarations stating unequivocally why that they are not co-inventors, and therefore no further evidence is required to establish that Dr. Bahattab is the sole inventor of the '457 patent.

Juniper asserts that there is further evidence that the co-authors of the ASTC article are co-inventors because of the use of plural pronouns, *i.e.*, "we" and "us," and that there is significance to the fact that Dr. Bodhan Bodnar is listed first on the ASTC article.  "Unsupported assertions that a fact is material do not make it so."  *Advanced Respiratory, Inc. v. Electromed, Inc.*, No. Civ. 00-2646 (DWF/SRN), 2002 WL 31386740, at *4 (D. Minn. Oct. 22, 2002).  This is simply a case of Juniper grasping at straws in its attempt to find *any* evidence to support its inequitable conduct claims.  In *Ex parte Raikhel*, the Board held that the examiner's speculation that a co-author was a co-inventor of the subject matter claimed in the application due to the repeated use of the pronoun "we" in later published papers was error.  1996 WL 1771220, at *7 (B.P.A.I. 1996).  The Board, following *Katz*, held that this kind of speculation was "expressly cautioned against." *Id.*

Juniper's assertions are easily and fully refuted in the supplemental declarations.  Dr. Evens states that she advised Dr. Bahattab to use the "editorial 'we' in his thesis and in his scientific papers" because this was the customary style for dissertations and engineering papers.  Exh. 8, Evens Supp. Decl. ¶ 5.  Dr. Bodnar states that his name was listed first on the ASTC article because it was a requirement of his then employer Lucent, that Lucent employees be listed first on articles they co-authored with non-Lucent employees.  Exh. 3, Bodnar Supp. Decl. ¶ 10.

14

Juniper fails to establish that the existence of co-authors on the ASTC article is material and therefore summary judgment should be granted.

C.  There was No Intent to Deceive the Patent Office because the Article and its Co-authors were Disclosed.

Juniper cannot provide any evidence of an intent to deceive because it is clear from the record that Dr. Bahattab did disclose the ASTC article to the Patent Office, and because the existence of co-authors on the ASTC article is not material to the patentability of the '457 patent. Juniper has the burden at trial of proving deceptive intent by clear and convincing evidence. *See AT & T*, 2004 WL 232725, *6 (the burden of proving deceptive intent is on the party asserting a claim of inequitable conduct, the other party does not have to prove good faith). Juniper rests its entire allegation of deceptive intent on the fact that Dr. Bahattab did not provide a copy of the ASTC article to the Patent Office. However, mere knowledge of withheld information is not an indication of an intent to deceive. *Mentor H/S*, 244 F.3d at 1378. There must be a factual basis for a determination of intent to deceive. *Union Pac. Res.*, 236 F.3d at 694.

Even presuming, *arguendo*, that a failure to provide a copy of the ASTC article was negligent or even grossly negligent, this presumption is not enough to prove any intent to deceive by Dr. Bahattab. *Ulead Sys.*, 351 F.3d at 1145-6. There is no evidence of a deliberate decision to withhold even a known material reference when the applicant unambiguously incorporates the reference into the specification of the patent-in-suit. *Grantley*, 540 F. Supp. 2d at 730. When making a determination regarding intent, the court must weigh all the evidence, including the good faith evidence. *Blackhawk Molding, Co. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 968 (N.D. Ill. 2006). There is evidence of good faith here because Dr. Bahattab did disclose the

15

article to the Patent Office in his provisional patent application, which was included in his patent application through incorporation by reference. "An applicant's conduct in its entirety must 'manifest [ ] a sufficiently culpable state of mind to warrant a determination that it was inequitable.'" *Halliburton*, 925 F.2d at 1443 (citations omitted). In contrast, Juniper has failed to provide any evidence of deceptive intent, therefore the court cannot find inequitable conduct and summary judgment must be granted. *See AT & T*, 2004 WL 232725, *4 (holding that "a court cannot find inequitable conduct on an evidentiary record that is completely devoid of evidence of the patentee's intent to deceive the PTO.") (citations and quotations omitted).

    III.    Juniper's Pleading of Inequitable Conduct is Insufficient

Allegations of inequitable conduct must be stated with particularity pursuant to Fed. R. Civ. P. 9(b). *Intex Recreation Corp. v. Team Worldwide Corp.*, 390 F. Supp. 2d 21, 24 (D.D.C. 2005) (Friedman, J.). Rule 9(b) requires Juniper to state in their Complaint the "way in which [non-submittal of the ASTC article] was misleading to the PTO." *Id.* at 25. If a pleading lacks particularity, this Court has "'liberal discretion' to strike such filings as it deems appropriate. " *Id.* at 24. Claims of inequitable conduct should be stricken ". . . where it is clear that the affirmative defense is irrelevant and frivolous and its removal from the case would avoid wasting unnecessary time and money litigating the invalid defense." *Id.* (quoting *Ass'n of Am. Med. Colleges. v. Princeton Review, Inc.*, 332 F.Supp.2d 11, 22 (D.D.C. 2004)) (emphasis added).

In its Complaint, Juniper did not state with particularity any inventive contribution of Drs. Bodnar, Evens, or Kraft sufficient to allege the way in which withholding the ASTC article would be misleading to the Patent Office on the issue of inventorship. *See* Compl. at ¶¶ 17-26. Juniper attempts to evade the requirements of Rule 9(b) by simply alleging that Dr. Bahattab was

16

a co-author of a scientific article without identifying the way in which any of the co-authors are co-inventors. *See* Compl. at ¶ 22. Even when articulating its Complaint's allegations, Juniper fails to explain where or how it pled with particularity any inventive contributions of any co-author, or otherwise how a failure to disclose the ASTC article would mislead the Patent Office in any way. *See* Plaintiff's Responsive Brief at 19. Instead, it is on the sole and insufficient basis of co-authorship that Juniper alleges generally the "existence of other inventors." Compl. at ¶ 26, ¶ 19.

Both the Patent Office and the courts have warned that co-authorship alone is not evidence of co-inventorship. *See Katz*, 687 F.2d at 455 ("[C]o-authors may not be presumed to be co-inventors merely from the fact of co-authorship"); *Seaborg*, 1961 WL 7840, 131 U.S.P.Q. at 203 ("[W]e would emphasize that the bare fact that [another individual] is the literary co-author [of an article including a description of the claimed invention] is not evidence of joint inventorship."). It was therefore incumbent on Juniper, in view of the particularity requirement of Fed. R. Civ. P. 9(b) and the distinction between authorship and inventorship, to instigate a pre-suit investigation sufficient to allege how, in fact, Dr. Bahattab is not the sole inventor of the '457 patent. Had Juniper done so, it would have readily determined that the nature and circumstances surrounding the publication did not form a reasonable basis for an allegation of inequitable conduct, and it would have avoided the disfavored allegations that necessitated this briefing.

> Inequitable conduct is a much-abused and too often last-resort allegation. . . . As in many patent cases, the issue of inequitable conduct deflects the court's attention from the issues of validity and infringement. . . . An infringement defendant in complex litigation should not be permitted to sidestep these main issues by nit-picking the patent file in every minute respect with the effect of trying the patentee personally, rather than the patent.

17

*Ortho Pharm. Corp. v. Smith*, No. 90-0242, 1990 WL 121353, 18 U.S.P.Q.2d 1977, 1991 (E.D. Pa. 1990), *aff'd*, 959 F.2d 936 (Fed. Cir. 1992).


IV.    Juniper Fails to Satisfy the Requirements for a Rule 56(f) Delay.

Juniper does not meet the requirements for a Rule 56(f) delay.  District courts have discretion in determining whether they should permit discovery before ruling on a summary judgment motion, *U.S. ex rel. Fisher v. Network Software Assocs.*, 227 F.R.D. 4, 8 (D.D.C. 2005), and this Court should decline to exercise that discretion here.  Juniper, the party requesting discovery, carries the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the motion.  *Fisher*, 227 F.R.D. at 9.  Juniper has not done either in its opposition memorandum. Juniper must also show a reasonable basis to suggest that discovery will reveal a triable fact. *Fisher*, 227 F.R.D. at 9; *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999).  Juniper's arguments regarding the use of plural pronouns should not be entertained by the court without specific factual evidence that contradicts the declarations in evidence, factual evidence that Juniper does not provide.  Furthermore, the opposing party, Juniper, must provide some reason to question the truthfulness of the affidavits submitted in support of the summary judgment motion before the court can deny or delay a ruling.  *Strang v. U.S. Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989).  Simple statements of need are not sufficient when the record does not support that need.  *Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1415 (D.C. Cir. 1995).  It has long been established that conclusory allegations without factual support do not create genuine issues of material fact.  *Exxon Corp. v FTC*, 663 F.2d 120, 126 (D.C. Cir. 1980).

A.   Co-authorship cannot, as a Matter of Law, Provide an Inference of Co-
inventorship.

Juniper does not identify any facts that could be obtained to prove that the co-authors of
the ASTC article are co-inventors.  Juniper's numerous references to the advisors being listed as
co-authors on several papers and the use of plural pronouns throughout Dr. Bahattab's thesis and
the various publications does not meet this burden.  *See Raikhel*, 1996 WL 1771220, *7-8
(holding that speculation that co-author was also co-inventor due to use of "we" in published
paper was error.)  In addition, the declarations submitted in evidence provide a clear alternative
to Juniper's baseless allegations that the co-authors are co-inventors.  *See Katz,* 687 F.2d at 455.
As is established in the supplemental declarations, Dr. Evens states that she advised Dr. Bahattab
to change all the singular pronouns to plural to conform to the customary style of dissertations
and scientific papers.  Exh. 8, Evens Supp Decl. ¶ 5; *see also* Exh. 2, Bodnar Supp. Decl. ¶ 5,
(stating that it is customary practice to use plural pronouns.)  Despite Juniper's attempt to read
some significance into the order of the authors on the ASTC article, Dr. Bodnar's declaration
states that his name was listed first because Lucent, his employer at the time, required that all
articles listing Lucent and non-Lucent employees as authors must list the Lucent employees first.
Exh. 2, Bodnar Supp Decl. ¶ 10.  Dr. Bahattab's advisors have never held themselves out to be
co-inventors or suggested that they had anything to do with the conception of the invention,
significantly or otherwise.  In fact, Dr. Bahattab and his advisors were merely conforming to the
customary style of theses and papers published on the basis of thesis work.  No reasonable juror
could find otherwise.

> B. The Declarations of Dr. Bahattab and his Advisors Provide Conclusive Evidence that Dr. Bahattab is the Sole Inventor of the Invention Disclosed in the '457 patent.

It is true that no formal discovery has been initiated in this case. However, Dr. Bahattab has provided declarations answering in the affirmative the question of whether he is the only inventor of the '457 patent. Such declarations are dispositive even before the Patent Office issues the patent issues and the presumption of validity attaches. *Katz,* 687 F.2d at 455; *Seaborg*, 1961 WL 7840, 131 U.S.P.Q. at 203; *see also Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("Patent issuance creates a presumption that the named inventors are the true and only inventors."). In the face of this presumption, Juniper "must prove Drs. Bodnar, Evans, or Kraft's] contribution to the conception of the claims by clear and convincing evidence. . . . [and] must supply evidence to corroborate his testimony. " *Ethicon*, 135 F.3d 1456 at 1461. Discovery on the inventorship issue, therefore, is completely unnecessary, and would be futile in light of the declarations. These declarations establish that Dr. Bahattab's thesis advisors are not co-inventors of the '457 patent. In the face of these declarations, there is no reasonable jury that could return a verdict that Dr. Bahattab's advisors are co-inventors of the '457 patent. *See Takeda*, 511 F.Supp. 2d at 86 (holding that the opposing party meets its burden only if a reasonable jury could return a verdict for that party); *Anderson*, 477 U.S. at 249 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.")

It is astonishing that in, light of these unassailable declarations, Juniper is still requesting time to conduct discovery to depose Dr. Bahattab and his three doctoral thesis advisors to determine whether they are co-inventors of the '457 patent. Juniper suggests they need discovery to "ascertain [the advisors'] respective roles in the development of the technology that

20

eventually issued as the '457 patent." *See* Memorandum in Opposition, p. 17. This information has already been provided in an incontrovertible manner. Dr. Evens, Dr. Bodnar and Dr. Kraft submitted declarations, executed under penalty of perjury, stating that they are not co-inventors of the '457 patent. Exhs. 5, 4, & 6, Evens Decl. ¶ 12, Bodnar Decl. ¶ 13 and Kraft Decl. ¶ 12. Each advisor also stated what his and her individual role was as an advisor for Dr. Bahattab. Exhs. 5, 4, & 6, Evens Decl. ¶ 8, Bodnar Decl. ¶¶ 8-9 and Kraft Decl. ¶¶ 7-8. Each of the advisors expressly denies that he or she had anything to do with the conception or the research behind the invention published by the '457 patent. Each affirmatively states that the ideas were exclusively Dr. Bahattab's and that the ideas were original.

It is not surprising that Juniper has not identified any facts that could be discovered which would create a triable issue for the jury. Moreover, Juniper has not provided any evidence to suggest that the declarations provided by Dr. Bodnar, Dr. Evens and Dr. Kraft, on this issue, are not true. *See Strang*, 864 F.2d at 861 (opposing party is required to provide a reason to question the veracity of declarations supporting a summary judgment motion before a court can delay a ruling or deny summary judgment.) All that Juniper has provided are unsupported allegations that Dr. Bahattab's advisors have held themselves out for the past eight years as active participants in the research behind the '457 patent, perhaps hoping that the court will grant its request for a fishing expedition. Juniper has not directed the court to one shred of evidence that could be discovered, nor has it explained why it did not contact Drs. Bodnar, Evens and Kraft before filing their Complaint alleging inequitable conduct. Juniper's belated plea to depose witnesses that have always been accessible and available, especially when a telephone call would have alerted it to the fallacy of its claims, does not meet the Rule 56(f) requirements to identify

the evidence that discovery is expected to disclose and why it could not offer this evidence in opposition to the summary judgment motion.

It should be noted that Drs. Bodnar, Evens and Kraft are not beholden to Dr. Bahattab. They are equally available and accessible to Juniper, if not more so. Juniper simply chose to not avail itself of the opportunity to speak with these witnesses before impugning Dr. Bahattab's reputation. Dr. Bahattab is entitled to have Juniper's unfounded allegations of inequitable conduct cleared without further delay where, as here, the record supports only one conclusion. Dr. Bahattab, as a matter of law, is the sole inventor of his patent and there was no inequitable conduct in the prosecution of his patent.

## CONCLUSION

Defendant Dr. Bahattab has provided dispositive evidence that he is the only inventor of the '457 patent and therefore, that there are no genuine issues of material fact. He respectfully requests that this Honorable Court enter an order granting summary judgment in his favor, and against Juniper, as to that part of Count I that is addressed to the inventorship of the '457 patent and all of Count II of the Complaint and such other relief as the Court deems just and proper.

Dated: May 23, 2008                    Respectfully submitted,

                                       DEWEY & LEBOEUF, LLP
                                       1101 New York Avenue, N.W., Suite 1100
                                       Washington, D.C. 20005-4213
                                       hasbill@dl.com
                                       Tel: 202-986-8141
                                       Fax: 202-956-3263

                                       By:   s/Henry W. Asbill_____
                                       Henry W. Asbill (DC Bar No. 938811)

                                       FERRELL LAW, P.A.
                                       34th Floor, Miami Center
                                       201 South Biscayne Blvd.
                                       Miami, FL 33131
                                       gmahfood@ferrellworldwide.com
                                       Tel: 305-371-8585
                                       Fax: 305-371-5732

                                       By: s/George G. Mahfood_____
                                       George G. Mahfood (Fl. Bar No. 0077356)
                                       *Attorneys for the Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

     Plaintiff,

          v.                                  Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

     Defendant.
_____/

CERTIFICATE OF SERVICE

     I hereby certify that on May 23, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

                                  Respectfully submitted,
                                  DEWEY & LEBOEUF, LLP
                                  1101 New York Avenue, N.W., Suite 1100
                                  Washington, D.C. 20005-4213
                                  hasbill@dl.com
                                  Tel: 202-986-8141
                                  Fax: 202-956-3263

                                By:  _s/Henry W. Asbill_____
                                      Henry W. Asbill (DC Bar No. 938811)

SERVICE LIST

JUNIPER NETWORKS, INC. v. ABDULLAH ALI BAHATTAB

CASE NO.: Case No.: 1:07-cv-01771-PLF
United States District Court for the District Of Colombia


Alan M. Fisch
E-mail:  afisch@kayescholer.com
Jason F. Hoffman
E-mail:  jahoffman@kayescholer.com
David L. Cousineau
E-mail:  dcousineau@kayescholer.com
Kay Scholer LLP
The McPherson Building
901 Fifteenth Street, N.W.
Washington, DC  20005
Tel:  202-682-3500 / Fax:  202-682-3580
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                                                        Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM**
**IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II**

# EXHIBIT 1

09/633754
08/07/00

| ISSUE CLASSIFICATION | | |
| Subclass | 232 |
| Class | 370 |

PATENT NUMBER

6816457

6816457

## U.S. UTILITY Patent Application

| O.I.P.E. | PATENT DATE |
| M.M. SCANNED BK® Q.A. CS | NOV 09 2004 |

| APPLICATION NO. | CONT/PRIOR | CLASS | SUBCLASS | ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 09/633754 | D | 370 | 232 | 2664 | Schultz |

APPLICANTS

Abdullah Bahattab

TITLE

Predictive routing table cache population

PTO-2040
12/99

---

| ISSUING CLASSIFICATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **ORIGINAL** | | **CROSS REFERENCE(S)** | | | | | | |
| CLASS | SUBCLASS | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | | |
| 370 | 232 | 370 | 234 | | | | | |
| **INTERNATIONAL CLASSIFICATION** | | | | | | | | |
| H 0 4 L | 12/56 | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

☐ Continued on Issue Slip Inside File Jacket

7/26/04        Formal Drawings (5 sheet set)        8/7/00

| ☐ TERMINAL DISCLAIMER | DRAWINGS | | | CLAIMS ALLOWED | |
|---|---|---|---|---|---|
| | Sheets Drwg. | Figs. Drwg. | Print Fig. | Total Claims | Print Claim for O.G. |
| | 5 | 6 | 1 | 2 | 1 |

| ☐ The term of this patent subsequent to _____ (date) has been disclaimed. | NOTICE OF ALLOWANCE MAILED |
| | William Schultz 2/10/04 |
| | (Assistant Examiner)        (Date) |
| ☐ The term of this patent shall not extend beyond the expiration date of U.S. Patent No. _____ | 4/29/04 |
| | ISSUE FEE        KGM |
| ☐ | (Primary Examiner)        2/22/04 | Amount Due | Date Paid |
| | (Date) | $665.00 | 5/28/04 |
| ☐ The terminal ____ months of this patent have been disclaimed. | ISSUE BATCH NUMBER |
| | Jacqueline Weir 2-26-04 |
| | (Legal Instruments Examiner)        (Date) | |

**WARNING:**
The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368.
Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A
(Rev. 6/99)

FILED WITH:  ☐ DISK (CRF)   ☐ FICHE   ☐ CD-ROM
(Attached in pocket on right inside flap)

## ISSUE FEE IN FILE

(FACE)



09633754

08/07/00

INITIALS _HH_

# CONTENTS

|  | | Date Received (Incl. C. of M.) or Date Mailed |
|---|---|---|
| 1. Application _____ papers | | |
| 2. IDS | 8-7-00 | |
| 12-15 3. Req. 3 mos | 12.18.03 | |
| 4. Amdt. A | 2/2/04 | |
| 2-2 5. Notice of Allowance | 4/29/04 | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| 16. | | |
| 17. | | |
| 18. | | |
| 19. | | |
| 20. | | |
| 21. | | |
| 22. | | |
| 23. | | |
| 24. | | |
| 25. | | |
| 26. | | |
| 27. | | |
| 28. | | |
| 29. | | |
| 30. | | |
| 31. | | |
| 32. | | |
| 33. | | |
| 34. | | |
| 35. | | |
| 36. | | |
| 37. | | |
| 38. | | |
| 39. | | |
| 40. | | |
| 41. | | |

| | Date Received (Incl. C. of M.) or Date Mailed |
|---|---|
| 42. | |
| 43. | |
| 44. | |
| 45. | |
| 46. | |
| 47. | |
| 48. | |
| 49. | |
| 50. | |
| 51. | |
| 52. | |
| 53. | |
| 54. | |
| 55. | |
| 56. | |
| 57. | |
| 58. | |
| 59. | |
| 60. | |
| 61. | |
| 62. | |
| 63. | |
| 64. | |
| 65. | |
| 66. | |
| 67. | |
| 68. | |
| 69. | |
| 70. | |
| 71. | |
| 72. | |
| 73. | |
| 74. | |
| 75. | |
| 76. | |
| 77. | |
| 78. | |
| 79. | |
| 80. | |
| 81. | |
| 82. | |

(LEFT OUTSIDE)

ISSUE SLIP STAPLE AREA (for additional cross references)

| POSITION | INITIALS | ID NO. | DATE |
|---|---|---|---|
| FEE DETERMINATION | | 7533 | |
| O.I.P.E. CLASSIFIER | PH | | 8/19 |
| FORMALITY REVIEW | | 68608 | 10/3/2002 |
| RESPONSE FORMALITY REVIEW | | | |

## INDEX OF CLAIMS

| | | | | |
|---|---|---|---|---|
| ✔ | ................... Rejected | N | ................... | Non-elected |
| = | ................... Allowed | I | ................... | Interference |
| — | (Through numeral) Canceled | A | ................... | Appeal |
| ÷ | ................... Restricted | O | ................... | Objected |

| Claim | | Date | Claim | | Date | Claim | | Date |
|---|---|---|---|---|---|---|---|---|
| Final | Original | | Final | Original | | Final | Original | |
| | 1 | | | 51 | | | 101 | |
| | 2 | | | 52 | | | 102 | |
| | 3 | | | 53 | | | 103 | |
| | 4 | | | 54 | | | 104 | |
| | 5 | | | 55 | | | 105 | |
| | 6 | | | 56 | | | 106 | |
| | 7 | | | 57 | | | 107 | |
| | 8 | | | 58 | | | 108 | |
| | 9 | | | 59 | | | 109 | |
| | 10 | | | 60 | | | 110 | |
| | 11 | | | 61 | | | 111 | |
| | 12 | | | 62 | | | 112 | |
| | 13 | | | 63 | | | 113 | |
| | 14 | | | 64 | | | 114 | |
| | 15 | | | 65 | | | 115 | |
| | 16 | | | 66 | | | 116 | |
| | 17 | | | 67 | | | 117 | |
| | 18 | | | 68 | | | 118 | |
| | 19 | | | 69 | | | 119 | |
| | 20 | | | 70 | | | 120 | |
| | 21 | | | 71 | | | 121 | |
| | 22 | | | 72 | | | 122 | |
| | 23 | | | 73 | | | 123 | |
| | 24 | | | 74 | | | 124 | |
| | 25 | | | 75 | | | 125 | |
| | 26 | | | 76 | | | 126 | |
| | 27 | | | 77 | | | 127 | |
| | 28 | | | 78 | | | 128 | |
| | 29 | | | 79 | | | 129 | |
| | 30 | | | 80 | | | 130 | |
| | 31 | | | 81 | | | 131 | |
| | 32 | | | 82 | | | 132 | |
| | 33 | | | 83 | | | 133 | |
| | 34 | | | 84 | | | 134 | |
| | 35 | | | 85 | | | 135 | |
| | 36 | | | 86 | | | 136 | |
| | 37 | | | 87 | | | 137 | |
| | 38 | | | 88 | | | 138 | |
| | 39 | | | 89 | | | 139 | |
| | 40 | | | 90 | | | 140 | |
| | 41 | | | 91 | | | 141 | |
| | 42 | | | 92 | | | 142 | |
| | 43 | | | 93 | | | 143 | |
| | 44 | | | 94 | | | 144 | |
| | 45 | | | 95 | | | 145 | |
| | 46 | | | 96 | | | 146 | |
| | 47 | | | 97 | | | 147 | |
| | 48 | | | 98 | | | 148 | |
| | 49 | | | 99 | | | 149 | |
| | 50 | | | 100 | | | 150 | |

If more than 150 claims or 10 actions
staple additional sheet here

(LEFT INSIDE)

| SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| 370 | 229 230 230.1 231 232 234 235 389 392 395.7 428 429 | 12/9/03 | wcs |
| 370 | 395.2 395.21 | 2/20/04 | wcs |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | | |
|---|---|---|
| | Date | Exmr. |
| uspat, Epo, Jpo NPL (IEEE) | 12/9/03 | wcs |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Sub. | Date | Exmr. |
| 370 | 232 234 | 2/10/04 | wcs |

(RIGHT OUTSIDE)



UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

Bib Data Sheet

| SERIAL NUMBER 09/633,754 | FILING DATE 08/07/2000 RULE _ | CLASS 370 | GROUP ART UNIT 2664 | ATTORNEY DOCKET NO. 1 |
|---|---|---|---|---|

**APPLICANTS**

    Abdullah Ali Bahattab, Chicago, IL ;

** CONTINUING DATA ***************************
    THIS APPLN CLAIMS BENEFIT OF 60/208 888 06/02/2000

** FOREIGN APPLICATIONS *********************

IF REQUIRED, FOREIGN FILING LICENSE
GRANTED ** 10/03/2000          ** SMALL ENTITY **

| Foreign Priority claimed ☐ yes ☑ no | STATE OR COUNTRY IL | SHEETS DRAWING 5 | TOTAL CLAIMS 4 | INDEPENDENT CLAIMS 2 |
|---|---|---|---|---|
| 35 USC 119 (a-d) conditions met ☐ yes ☑ no ☐ Met after Allowance | | | | |
| Verified and Acknowledged    Examiner's Signature    Initials | | | | |

**ADDRESS**

22897

**TITLE**

Predictive routing table cache population

| FILING FEE RECEIVED 345 | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT No. _____ for following: | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees ( Filing ) |
| | | ☐ 1.17 Fees ( Processing Ext. of time ) |
| | | ☐ 1.18 Fees ( Issue ) |
| | | ☐ Other _____ |
| | | ☐ Credit |

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

8/17/2000 JWASHING 00000001 09633754
1 FC:201                          345.00 OP

PTO-1556
(5/87)
U.S. GPO: 1999-459-082/19144

*08-08-00*

A.A. Bahattab 1



# IN THE UNITED STATES
## PATENT AND TRADEMARK OFFICE

**PATENT APPLICATION**

**INVENTOR** Abdullah Ali Bahattab

**CASE**     1

**TITLE**    Predictive Routing Table
           Cache Population

<div style="border:1px solid">
"Express Mail" mailing label number <u>EK594326170US</u>;
Date of Deposit: August 7, 2000

I hereby certify that this application is being deposited with the
United States Postal Service "Express Mail Post Office to
Addressee" service under 37 CFR 1.10 on the date indicated
above and is addressed to "Box PATENT APPLICATION,
Assistant Commissioner of Patents, Washington, D.C. 20231"
Jason Paul DeMont
</div>

**ASSISTANT COMMISSIONER FOR PATENTS**
**WASHINGTON, D.C. 20231**

**SIR:**

Enclosed are the following papers relating to the above-named application for patent:

1. Transmittal Letter — 2 Pages (3x)
2. Executed PTO/SB/09 Statement Claiming Small Entity Status — 1 Page (1x)
3. Specification — 14 Pages (1x)
4. Informal Drawings — 5 Sheets (1x)
5. Declaration and Power of Attorney — 2 Pages (1x)
6. Information Disclosure Statement Cover Sheet — 1 Page (1x)
7. Information Disclosure Statement PTO-1449 Substitute — 1 Page (1x)
8. Two References Accompanying Information Disclosure Statement — 1 Page (1x)
9. Check for $345.00 to Cover Filing Fee

| CLAIMS AS FILED | | | | |
|---|---|---|---|---|
| | NO. FILED | NO. EXTRA | RATE | CALCULATIONS |
| Total Claims | 4 - 20 = | 0 | x $9 = | 0 |
| Independent Claims | 2 - 3 = | 0 | x $39 = | 0 |
| Multiple Dependent Claim(s), if applicable | | | x $270 = | 0 |
| Basic Fee | | | | $345 |
| | | | TOTAL FEE: | $345 |

   **The Applicant is a Small Entity.** Please file the application and find a check enclosed in the amount of $345 to cover the filing fee.

   Duplicate copies of this letter are enclosed. In the event of non-payment or improper payment of a required fee, the Commissioner is authorized to charge or to credit **Jason Paul DeMont Deposit Account No. 50-1045** as required to correct the error.

   Please address all correspondence to:

<div style="border:1px solid">
**Customer Number 22897**
</div>

A.A. Bahattab 1

Pursuant to 37 C.F.R. 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as incorporating a petition for extension of time for the appropriate length of time.

Respectfully,

By_____
Jason Paul DeMont
Attorney for Applicants
Reg. No. 35,793
908-903-1255

Date: _August 7, 2000_
DeMont & Breyer, L.L.C.
P.O. Box 437
Basking Ridge, NJ 07920-0437

- 2 of 2 -

A.A. Bahattab 1

## Abstract

1    A router and method for routing table cache population technique is disclosed. In particular,

2    the illustrative embodiment routes packets through it more quickly than comparatively expensive

3    routers in the prior art. The present invention recognizes that a fast router has small routing table cache

4    that has a high hit ratio and that a high hit ratio can be achieved with a small routing table cache by

5    predicting which entries will be needed in the routing table cache in the future and by populating the

6    routing table cache with those entries before they are needed. The illustrative embodiment of the

7    present invention comprises: an input port for receiving a succession of packets, wherein each of the

8    packets comprises a destination address; a plurality of output ports; a switching fabric for

9    interconnecting the input port to each of the plurality of output ports; a processor or building a

10   temporal model of the occurrence of the destination addresses at the input port, for populating the

11   routing table cache based on the temporal model and at least one entry that is stored in a routing table,

12   and for routing at least one of the packets from the input port to one of the output ports through the

13   switching fabric based on the entry that is stored in the routing table cache

A.A. Bahattab 1

# PREDICTIVE ROUTING TABLE CACHE POPULATION

## Cross-Reference to Related Applications

This application claims the benefit of U.S. Provisional Application No. 60/208,888, filed June 2, 2000, which provisional application is incorporated by reference.

5

## Field of the Invention

The present invention relates to telecommunications and computer networks in general, and, more particularly, to the design of a router for use in a packet network.

## Background of the Invention

In a packet network, the finite speed of light and the finite speed at which a router can operate
10 precludes the traversal of a packet from one side of the network to another instantaneously. Therefore, there is always some delay between when a transmitting network terminal transmits a packet and when the receiving network terminal receives the packet.

In some cases, this delay is unimportant. For example, some data (*e.g.*, most e-mail messages, *etc.*) is not perishable or highly time-sensitive and the sender and receiver of the data might consider it
15 unimportant whether the packet takes 5 milliseconds, 5 seconds or even 5 minutes to traverse the network. In contrast, other data (*e.g.*, voice, full-motion video, instant messaging, *etc.*) is perishable or highly time-sensitive, and, therefore, the sender and receiver of the data might consider it very important that the packets traverse the network quickly.

When packet networks were originally conceived and designed and constructed, little or no
20 consideration was given to ensuring that a fixed number of packets could be sent across a packet network with a maximum delay. Average delays were considered, and packet networks were engineered to consider average delays, but little or no consideration was given to engineering the maximum delay. Increasingly, however, packet networks are being considered for carrying time-sensitive data for applications such as Internet telephony and television broadcasting.

25 Perhaps the most significant source of delay in a packet network is due to the speed at which the routers operate. It is well known in the prior art how to make and use fast routers, but their extra speed comes at a price, and, therefore, it is not typically economical to build them. In fact, it is well known in the prior art how to trade cost for performance when designing and building routers.

Nevertheless, the need exists for a router that is more powerful than comparatively expensive
30 routers in the prior art.

- 1 of 14

2

A.A. Bahattab 1

## Summary of the Invention

The present invention is a router and routing table cache population technique that avoids some of the costs and disadvantages associated with techniques in the prior art. In particular, the illustrative embodiment routes packets through it more quickly than comparatively expensive routers
5    in the prior art.

The present invention recognizes that a router with a small routing table cache can be fast if the routing table cache has a high hit ratio, and that a high hit ratio can be achieved by predicting which entries will be needed in the routing table cache in the future and by populating the routing table cache with those entries before they are needed. In accordance with the illustrative embodiment of the
10    present invention, this is accomplished by: (i) building one or more temporal models of the occurrence of needed entries based on empirical data, (ii) by using the temporal model(s) to predict which entries are most likely to be needed at some time in the future, and (iii) by populating the router table cache with those entries before they are needed.

The illustrative embodiment of the present invention comprises: an input port for receiving a
15    succession of packets, wherein each of the packets comprises a destination address; a plurality of output ports; a switching fabric for interconnecting the input port to each of the plurality of output ports; a processor or building a temporal model of the occurrence of the destination addresses at the input port, for populating the routing table cache based on the temporal model and at least one entry that is stored in a routing table, and for routing at least one of the packets from the input port to one of
20    the output ports through the switching fabric based on the entry that is stored in the routing table cache.

### Brief Description of the Drawings

FIG. 1 depicts a block diagram of the salient components of a router in accordance with the illustrative embodiment of the present invention.
25    FIG. 2 depicts a block diagram of the salient components of input port 101, which is a component of the router in FIG. 1.

FIG. 3 is a graph that depicts the relationship of the hit ratio of routing table cache 203 as a function of the number of entries in routing table cache 203.

FIG. 4 is a graph that depicts the relationship of the average search time for routing table
30    cache 203 as a function of the number of entries in routing table cache 203.

- 2 of 14

3

A.A. Bahattab 1

FIG. 5 depicts a flowchart of the salient steps performed by router 100 each time it receives and routes a packet.

FIG. 6 depicts a flowchart of the steps involved in periodically or sporadically generating a temporal model, as depicted in FIG. 5

5

### Detailed Description

FIG. 1 depicts a block diagram of the salient components of a router in accordance with the illustrative embodiment of the present invention. Because the nomenclature of packet networking is not well standardized, a router is sometimes called a "packet switch," a "datagram switch," a "cell switch," an "ATM switch," a "gateway," a "firewall," or a "bridge" depending on the purpose for which the router is being used and on the educational and industrial background of the person using the term. However, for the purposes of this specification, a "**router**" is defined as a switch that is capable of receiving one or more packets, each of which comprises a destination address, and of routing each packet to an output port based on that destination address.

Router 100 comprises: input port 101, a plurality of output ports, output port 102-1 through 102-*j*, switching fabric 103, and router table 104, all interconnected as shown. Some embodiments of the present invention have more than one input port, and in those cases each input port works in the same manner as input port 101 and each contends with the others for access to routing table 104.

As is clear to those skilled in the art, switching fabric 103 is a space-division switch or a time-division switch or any combination of space-division switches and time-division switches (*e.g.*, a space-time-space-division switch, *etc.*) that is capable of transporting a packet from input port 101 to one of output ports 102-1 through 102-*j* under the direction of input port 101. It will be clear to those skilled in the art how to make and use switching fabric 103

Routing table 104 is a table that contains a plurality of entries. For the purpose of this specification, an "**entry**" is defined as a mapping of one or more network addresses to one or more output ports of a router. When an entry maps a network address to more than one of a router's output ports, the entry might implicitly or explicitly prioritize those output ports so that, for example, if one is congested, another might be used. Table 1 depicts an illustrative portion of routing table 104 that contains five illustrative entries, wherein the destination addresses are depicted in IPv4 dotted-decimal notation. The first four illustrative entries (*i.e.*, 110.23.43.15/102-73, 110.23.43.16/102-13, 110.23.43.17/102-44, and 110.23.43.18/102-26) are illustrative of individual network addresses. The fifth illustrative entry (*i.e.*, 112.7.111.x/102-15) is illustrative of an entry in which more than one network address is mapped to one of a router's output ports. It will be clear to those skilled in the art

-3 of 14

4

A. A. Bahattab 1

how to make and use embodiments of the present invention with other network addresses in other formats such as IPv6.

| Network Address | Output Port |
|-----------------|-------------|
| ... | ... |
| 110.23.43.15 | 102-73 |
| 110.23.43.16 | 102-13 |
| 110.23.43.17 | 102-44 |
| 110.23.43.18 | 102-26 |
| ... | ... |
| 112.7.111.x | 102-15 |
| ... | ... |

**Table 1 — Portion of Routing Table 104**

Routing table 104 can comprise a large number of entries (e.g., thousands, millions, billions, etc.), and

5    therefore, whether routing table 104 resides in random access memory (e.g., semiconductor memory, etc.) or not (e.g., hard disk, etc.), the shear number of entries in routing table 104 can cause the process of looking up a needed entry to be slow regardless of the data structure employed for storing the entries. Furthermore, when an embodiment of the present invention comprises more than one input port, the contention among the input ports can exacerbate the average latency associated with the

10    process of looking up a needed entry in routing table 104. It will be clear to those skilled in the art how to make and use routing table 104.

Output ports 102-1 through 102-j comprises the interface circuitry for receiving packets from switching fabric 103 and for transmitting the departing packets on the appropriate output. It will be clear to those skilled in the art how to make and use output ports 102-1 through 102-j.

15    FIG. 2 depicts a block diagram of the salient components of input port 101, which comprises: processor 201 and memory 202, which itself comprises routing table cache 203. Processor 201 is a special-purpose processor or a general-purpose processor whose instructions are stored in memory 202 or a combination of the two. Memory 202 is advantageously a small, fast semiconductor memory that holds the instructions and data for processor 201.

20    To ameliorate the latency associated with looking up routing information in routing table 104, input port 101 advantageously comprises routing table cache 203. Routing table cache 203 is a cache memory that advantageously holds the most frequently accessed entries of routing table 104. Table 2 depicts an illustrative portion of routing table cache 203.

25

A.A. Bahattab 1

| Network Address | Output Port |
|---|---|
| ... | ... |
| 110.23.43.15 | 102-73 |
| 110.23.43.18 | 102-26 |
| ... | ... |

**Table 2 — Portion of Routing Table Cache 203**

Typically, it is faster for processor 201 to retrieve an entry from routing table cache 203 than it is for processor 201 to retrieve the same entry from routing table 104 for three reasons. First, because routing table cache 203 is smaller than routing table 104, routing table cache 203 is typically stored in

5    a physically faster memory than is routing table 104 (*e.g.*, semiconductor RAM vs. hard disk, *etc.*) Second, processor 201 does not have to contend with other processors for access to routing table cache 203, whereas processor 201 would have to contend for access to routing table 104 when router 100 comprises a plurality of input ports. And third, because the number of entries in routing table cache 203 is typically orders of magnitude smaller than the number of entries in routing table 104, the

10    process of searching through routing table cache 203 for a needed entry is typically much smaller than is the process of searching through routing table 104 for the same entry, regardless of the data structure employed.

It will be clear to those skilled in the art how to decide how many entries routing table cache 203 should contain. In deciding this number, there are two factors that are advantageously considered.

15    First, as shown in FIG. 3, as the number of entries in routing table cache 203 increases, the hit ratio also increases, albeit with diminishing returns. This suggests that router 100 can be made faster by underlining{increasing} the number of entries in routing table cache 203. For the purposes of this specification, the phrase **"hit ratio"** is defined as the ratio of the number of entries that processor 201 finds in routing table cache 203 divided by the total number of entries that processor 201 needs.

20    Second, as shown in FIG. 4, as the number of entries in routing table cache 203 increases, the time it takes processor 201 to search through routing table cache 203 to find a needed entry also increases. This suggests that router 100 can be made faster by _decreasing_ the number of entries in routing table cache 203.

Although these two factors might seem to cancel each other, in general, the speed of router

25    100 is improved by having a small cache that is populated so as to have as high hit ratio as possible. The illustrative embodiment of the present invention seeks to have a high hit ratio by _proactively_ populating routing table cache 203. In particular, the illustrative embodiment populates routing table cache 203 by: (i) building a temporal model of the occurrence of needed entries based on

A.A Bahattab 1

empirical data, (ii) by using the temporal model to predict which entries are most likely to be needed at some time in the future, and (iii) by populating router table cache 203 with those entries before they are needed. This is in contrast to routing table cache population techniques in the prior art that are either: (i) random, or (ii) reactive.

5      A brief discussion of how router 100 would be populated in accordance with some routing table cache population techniques in the prior art will facilitate an understanding of how it is populated in accordance with the illustrative embodiment and will also assist in understanding the difference between the prior art and the illustrative embodiment

       One routing table cache population technique in the prior art is the "random population
10   technique." In accordance with the random population technique, routing table cache 203 would be populated with entries from routing table 104 that were selected at random. In other words, if routing table 104 contained $n$ entries, the probability that routing table cache 203 would be populated with any given entry would be $1/n$ Furthermore, in accordance with the random population technique, once routing table cache 203 was populated, its contents would not be changed in response to empirical data
15   on which entries were actually needed. The advantage of the random population technique is that it requires little processing overhead, but the disadvantage is that it has a very low hit ratio — so low, in fact, that the random population technique is not much better than, and is possibly worse than, having no routing table cache at all.

       Another routing table cache population technique in the prior art is the "random replacement
20   technique " In accordance with this technique, routing table cache 203 would be initially populated with entries from routing table 104 that were selected at random. Thereafter, when processor 201 accessed a particular entry in routing table cache 203 ($i e$, a cache hit), processor 201 would do nothing to routing table cache 203, but when processor 201 did not find a needed entry in routing table cache 203 ($i e$, a cache fault) and had to resort to routing table 104 for the entry, processor 201 would
25   randomly replace an entry in routing table cache 203 with the entry just retrieved from routing table 104 The theory underlying this technique is based on the recognition that an entry that has been needed once is more likely to be needed again than is a randomly-chosen entry, and, therefore, this technique seeks to improve the hit ratio (in comparison to the random population technique) by seeking to anticipate what entries will be needed in the future. The advantages of the random
30   replacement technique are that it requires little processing overhead and that it usually has a higher hit ratio than the random population technique. It is disadvantageous, however, in that it does not take into consideration what entries are deleted and might delete a commonly needed entry. Furthermore,

A.A. Bahattab 1

in contrast to the illustrative embodiment of the present invention, the random replacement technique is reactive, which means that it would only populate routing table cache 203 with an entry in reaction to a need for that entry. That is, it only populates routing table cache 203 with an entry after than entry has been needed, in contrast to the present invention which populates routing table cache 203

5    with entries before they are needed. The random replacement technique is advantageous in that it requires little processing overhead, which decreases the average delay through router 100

A third replacement technique in the prior art is the "least-recently-used" or "LRU" technique. In accordance with the least-recently-used technique, routing table cache 203 would be <u>initially</u> populated with entries from routing table 104 that were selected at random. Thereafter, processor 201

10    would keep track of how recently each entry in routing table cache 203 was accessed. When processor 201 accesses a particular entry in routing table cache 203 (*i.e*, a cache hit), that entry would be marked as having been recently used, but when processor 201 did not find a needed entry in routing table cache 203 (*i.e*, a cache fault) and was forced to resort to routing table 104 for the entry, processor 201 would replace the least-recently-used entry in routing table cache 203 with the entry just

15    retrieved from routing table 104. The theory underlying this technique is based on the recognition that an entry that has been recently used is more likely to be needed again than is the least-recently-used entry. The least-recently-used technique is advantageous in that it has a high hit ratio relative to all known routing table cache replacement techniques in the prior art. The least-recently-used technique is disadvantageous in that it requires that processor 201 spend a great deal of time keeping track of

20    how recently each entry in routing table cache 203 is accessed, which increases the average delay through router 100. But like the random population technique and the random replacement technique, and in contrast to the illustrative embodiment, the least-recently-used technique is reactive.

FIG. 5 depicts a flowchart of the operation of the illustrative embodiment of the present invention, which seeks to have a high hit ratio by <u>predictively</u> populating routing table cache 203.

25    At step 501, processor 201 initially populates routing table cache 203 with entries from routing table 104 that are selected at random. It will be clear to those skilled in the art how to perform step 501

At step 502, as input port 101 receives a temporal succession of packets, each of which comprises a destination address. As part of step 502, processor 201 examines each packet to

30    determine the network address to which the packet is addressed. It will be clear to those skilled in the art how to perform step 502

A A Bahattab 1

At step 503, processor 201 retrieves the routing information for each destination address from routing table cache 203, if possible, and from routing table 104, if necessary. For example, if the network address to which the packet is addressed is "110.23.43.18," then processor 201 only need look in routing table cache 203 to determine that the packet is to be transmitted via output port 102-6 (see
5    Table 2) Alternatively, if the network address to which the packet is addressed is "110.23.43.17," then processor 201 *cannot* learn from routing table cache 203 how to direct the packet and must query routing table 104 to learn that the packet is to be transmitted via output port 102-4 (see Table 1). It will be clear to those skilled in the art how to perform step 503.

At step 504, processor 201 transmits each packet and the information on how it should be
10    routed (*i e*, the output port to which it should be routed) to switching fabric 103, which transports it to the appropriate port. It will be clear to those skilled in the art how to perform step 504.

At step 505, processor 201 continually compiles statistics on the temporal succession of packets. In particular, processor 201 advantageously counts how many times each entry is needed in a short time interval, such as 2 milliseconds, over a longer time horizon, such as 1 second. For example,
15    processor 201 advantageously knows how many times each entry was needed in each 2 millisecond interval during the prior 1 second. Therefore, processor 201 retains a data set (*i e*, 500 data points) for each destination address. Table 3 depicts an illustrative portion of the information compiled and retained in step 505.

| Time | ... | Address 110.23.43.17 | Address 110.23.43.18 | ..... |
|------|-----|----------------------|----------------------|-------|
| t = 0 | ... | 5 | 1 | ... |
| t = -2 ms | ... | 0 | 3 | ... |
| t = -4 ms | ... | 5 | 0 | ... |
| t = -6 ms | ... | 0 | 0 | ... |
| t = -8 ms | ... | 5 | 2 | ... |
| t = -10 ms | ... | 0 | 0 | ... |
| t = -12 ms | ... | 5 | 14 | ... |
| t = -14 ms | ... | 0 | 4 | ... |
| ... | ... | ... | ... | ... |
| t = -998 ms | ... | 5 | 12 | ... |
| t = -1000 ms | ... | 0 | 5 | ... |

20    **Table 3 — 500 Data Points for Destination Addresses**

The purpose of step 505 is to compile data on the need for each needed entry so as to determine if patterns can be discerned that can be exploited. For example, an examination of Table 3 reveals a

- 8 of 14

A A Bahattab 1

clear pattern of the need for the entry for network address 110.23.43.17 (i e , it is needed in alternating 2 millisecond intervals) but no such clear pattern is immediately apparent for the entry for network address 110.23.43.18. But merely because no such pattern is immediately apparent does not mean that a real pattern does not exist, and, therefore, the illustrative embodiment employs mathematical tools to

5    reveal the patterns.

As part of step 505, processor 201 periodically or sporadically determines the autocorrelation for each data set because it provides useful insight into the existence of temporal patterns within each data set. When the autocorrelations for each destination address are computed, a strong correlation is revealed to exist in some of the data points, which only a weak correlation is indicated in others. The

10    utility of this difference will be revealed in step 601, which is discussed below. The illustrative embodiment computes the autocorrelation for each destination address with a lag of $k = n/4 = 125$. The autocorrelation for a data set of $n$ data points, with lag $k$, is given by:

$$r_k = \frac{\sum_{t=1}^{N-k}(x_t - \bar{x})(x_{t+k} - \bar{x})}{\sum_{t=1}^{N}(x_t - \bar{x})^2} \qquad \text{(Eq. 1)}$$

At step 506, processor 201 periodically or sporadically builds a temporal model for the data

15    set associated with each destination address. In accordance with the illustrative embodiment, and as shown in FIG. 6, the building of the temporal model comprises two stages:

1    the segregation stage, and

2    the determination stage.

At step 601, the segregation stage, the illustrative embodiment determines which of the data

20    sets (whose autocorrelation was computed in step 505) are highly correlated and which are not. To do this, processor 201 determines a confidence band equal to $2\left(\dfrac{\pm 2}{\sqrt{n}}\right)$, where $n$ is the number of data points (e g , 500) in each data set. After the autocorrelation function for all lags are computed, then the mean of the autocorrelation functions is also computed. If the mean for a data set is greater than or equal to the confidence band, the illustrative embodiment considers that data set to be highly

25    correlated; otherwise it considers it to be not highly correlated.

At step 602, the determination stage, the illustrative embodiment selects a temporal model structure for each data set associated with each destination address. In other words, the illustrative embodiment seeks to select the temporal model structure for each data set that best predicts the future

- 9 of 14

A.A. Bahattab 1

occurrence of the destination address associated with the data set. In accordance with the illustrative embodiment of the present invention, processor 201 builds one temporal model based on the highly correlated data sets to predict the occurrence of all destination addresses whose data sets are highly correlated and builds one temporal model based on the not-highly correlated data sets to predict the
5   occurrence of all destination addresses whose data sets are not-highly correlated.

For the highly correlated data sets, the illustrative embodiment uses the autoregressive moving-average model (1, 2) structure

$$W_t = \Phi_1 w_{t-1} - \Theta_1 a_{t-1} - \Theta_2 a_{t-2} + a_t \qquad \text{(Eq. 2)}$$

and for the not highly correlated data sets, the illustrative embodiment uses the autoregressive moving-
10   average model (1, 3) structure

$$W_t = \Phi_1 w_{t-1} - \Theta_1 a_{t-1} - \Theta_2 a_{t-2} - \Theta_3 a_{t-3} + a_t \qquad \text{(Eq. 3)}$$

where $W_t$ is the value of the data point in a series after subtracting the mean of the series, $\Phi$ is the autoregressive parameter, which describes the effect of unit change in $W_{t-l}$ on $W_t$, $\Theta$ is the moving average parameter, the number (2 or 3) refers to the number of moving average parameters, and $a_t$ is
15   the white noise error.

It will be clear to those skilled in the art, however, that in alternative embodiments of the present invention other temporal model structures can be used. For example, one temporal model structure can be used for all of the data sets which obviates the necessity for computing autocorrelation of each data set and of categorizing each data set based on its correlation value. Furthermore, it will
20   be clear to those skilled in the art how to categorize each data set into two or more categories and to select different temporal model structures for each category. And still furthermore, it will be clear to those skilled in the art how to choose different temporal model structures than those shown above.

Next, processor 201 builds a temporal model for each of a randomly selected number (e.g., 10 to 20) of destination addresses that have highly correlated data sets and for each of a randomly
25   selected number (e.g., 10 to 20) of destination addresses that do not have highly correlated data sets. The reason that only a few models are built is because can be too computationally burdensome for processor 201 to build a different temporal model for each data set, and at least one of the temporal models that are built are likely to provide an acceptable model for the other data sets. In alternative embodiments of the present invention, processor 201 builds a unique temporal model for each data set.
30   It will be clear to those skilled in the art how to determine the number of models built given the computational resources available.

- 10 of 14

Next, processor 201 selects one temporal model from the dozen or so that were built in step 602 to use with all of the data sets that are highly correlated and one temporal model from the dozen or so that were built in step 602 to use with all of the data sets that are not highly correlated. To chose the best model for each group of data sets, the illustrative embodiment advantageously uses the mean

5    absolute error (MAE). This is done by determining which model does the best job of predicting the occurrence of not only its own future addresses, but also the best job of predicting the occurrence of the future addresses of the other addresses for which models were built in step 602. The best model is the one that in general has the lower values of mean absolute error for the data of the other addresses.

At the end of step 506, one temporal model is advantageously selected for predicting the

10   occurrence of addresses associated with highly correlated data sets and a second temporal model is advantageously selected for predicting the occurrence of addresses associated with not highly correlated data sets.

At step 507, processor 201 periodically or sporadically repopulates routing table cache 203 based on the temporal models built in step 506 and on the entries in routing table 104. To accomplish

15   this, processor 201 advantageously uses the model for the highly correlated data sets to predict the number of occurrences of each destination address in the next time interval (i.e., 2 milliseconds). If the model predicts that the destination address will be needed in the next time interval, processor 201 retrieves the entry for that destination address from routing table 104 and populates routing table cache 203 with that entry. If the model does not predict the occurrence of that destination address in the next

20   time interval, then processor 201 does nothing

If, after processor 201 has predicted the occurrence of each destination address associated with the highly correlated data, there is space in routing table cache 203 processor 201 next uses the model for the not highly correlated data sets to predict the number of occurrences of each destination address in the next time interval (i.e., 2 milliseconds). If the model predicts that the destination address will be

25   needed in the next time interval, processor 201 retrieves the entry for that destination address from routing table 104 and populates routing table cache 203 with that entry. If the model does not predict the occurrence of that destination address in the next time interval, then processor 201 does nothing. The reason processor 201 populates routing table cache 203 with the highly correlated data first is because if there isn't room in routing table cache 203 for both the highly correlated data and the not

30   highly correlated data, the highly correlated data sets should have priority.

To ameliorate interruptions, routing table cache 203 should comprises two portions, one of which is active and being used for routing packets and the other which is inactive and being populated

12

A A Bahattab 1

in accordance with step 507. This enables the predicted entries to be populated in the inactive portion and to switch that portion to active at the appropriate time.

     After step 507, control returns to step 502

     It is to be understood that the above-described embodiments are merely illustrative of the

5   present invention and that many variations of the above-described embodiments can be devised by those skilled in the art without departing from the scope of the invention. It is therefore intended that such variations be included within the scope of the following claims and their equivalents.

     What is claimed is:

13

A.A. Bahattab 1

1     1. A router comprising:

2        an input port for receiving a succession of packets, wherein each of said packets comprises a

3     destination address;

4             a plurality of output ports;

5             a switching fabric for interconnecting said input port to each of said plurality of output ports;

6             a processor or building a temporal model of the occurrence of said destination addresses at

7     said input port, for populating said routing table cache based on said temporal model and at least one

8     entry that is stored in a routing table, and for routing at least one of said packets from said input port to

9     one of said output ports through said switching fabric based on said entry that is stored in said routing

10    table cache.

1        2. The router of claim 1 wherein said temporal model is based on the autoregressive moving

2     average of the occurrence of said destination addresses.

1        3. A method comprising:

2        receiving a temporal succession of packets at an input port, wherein each of said packets

3     comprises a destination address;

4             generating a temporal model based on the occurrence of said destination addresses;

5             populating a routing table cache based on said temporal model and at least one entry that is

6     stored in a routing table; and

7             forwarding at least one of said packets from said input port to one of a plurality of output ports

8     based on said entry that is stored in said routing table cache.

1        4. The method of claim 3 wherein said temporal model is based on the autoregressive moving

2     average of the occurrence of said destination addresses

- 13 of 14

FROM : Abdullah Bahattab IIT Chicago    PHONE NO. : 312 3264529    Aug. 06 2000 12:11PM P1

PTO/SB/09 (12 97)
Approved for use through 9/30/00. OMB 0651-0031
Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

| STATEMENT CLAIMING SMALL ENTITY STATUS (37 CFR 1 9(f) & 1 27(b))--INDEPENDENT INVENTOR | Docket Number (Optional) A A  Bahattab 1 |
|---|---|

Applicant Patentee or Identifier: Abdullah Ali Bahattab

Application or Patent No.: Not Yet Assigned

Filed or Issued: Not Yet Assigned

Title: PREDICTIVE ROUTING TABLE CACHE POPULATION

As a below named inventor, I hereby state that I qualify as an independent inventor as defined in 37 CFR 1 9(c) for purposes of paying reduced fees to the Patent and Trademark Office described in:

☑ the specification filed herewith with title as listed above

☐ the application identified above

☐ the patent identified above

I have not assigned, granted, conveyed, or licensed and am under no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person who would not qualify as an independent inventor under 37 CFR 1.9(c) if that person had made the invention, or to any concern which would not qualify as a small business concern under 37 CFR 1 9(d) or a nonprofit organization under 37 CFR 1 9(e)

Each person, concern, or organization to which I have assigned, granted, conveyed or licensed or am under an obligation under contract or law to assign, grant, convey, or license any rights in the invention is listed below:

☑ No such person, concern, or organization exists.

☐ Each such person, concern, or organization is listed below

Separate statements are required from each named person, concern, or organization having rights to the invention stating their status as small entities (37 CFR 1 27)

I acknowledge the duty to file, in this application or patent, notification of any change in status resulting in loss of entitlement to small entity status prior to paying, or at the time of paying, the earliest of the issue fee or any maintenance fee due after the date on which status as a small entity is no longer appropriate (37 CFR 1 28(b))

Abdullah Ali Bahattab
NAME OF INVENTOR                 NAME OF INVENTOR                 NAME OF INVENTOR

Signature of inventor            Signature of inventor            Signature of inventor

8 - 6 - 2000
Date                             Date                             Date

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Washington, DC 20231.

FROM : Abdullah Bahattab IIT Chicago    PHONE NO. : 312 3264529    Aug. 06 2000 12:11PM P2

A A Bahattab 1

# IN THE UNITED STATES
## PATENT AND TRADEMARK OFFICE

### Declaration and Power of Attorney

As the below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name

I believe I am the original, first and sole inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled **PREDICTIVE ROUTING TABLE CACHE POPULATION** the specification of which is attached hereto

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by an amendment, if any, specifically referred to in this oath or declaration.

I acknowledge the duty to disclose all information known to me which is material to patentability as defined in Title 37, Code of Federal Regulations, 1.56.

I hereby claim the benefit under Title 35, United States Code, 119(e) of any United States provisional application(s) identified below:

Provisional application No. 60/208,888, filed on June 2, 2000

I hereby claim foreign priority benefits under Title 35, United States Code, 119 of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

None

I hereby claim the benefit under Title 35, United States Code, 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, 112, I acknowledge the duty to disclose all information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, 1.56 which became available between the filing date of the prior application and the national or PCT international filing date of this application:

None

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

I hereby appoint the following attorneys with full power of substitution and revocation, to prosecute said application, to make alterations and amendments therein, to receive the patent, and to transact all business in the Patent and Trademark Office connected therewith:

Jason Paul DeMont          (Reg No 35,793)
Wayne S. Breyer            (Reg. No 38,089)

- 1 of 2 -

FROM : Abdullah Bahattab IIT Chicago    PHONE NO. : 312 3264529        Aug. 06 2000 12:12PM P3

A A Bahattab 1

Full name of sole inventor: Abdullah Ali Bahattab

Inventor's signature_____ _____ _____Date_ 8-6-2000

Residence: Chicago. Cook County, Illinois

Citizenship: Saudi Arabia

Post Office Address:     3100 S. Michigan Avenue, Apt #902
                         Chicago IL 60616

Telephone calls should be made to Jason Paul DeMont at:

          Phone No :    908-903-1255
          Fax No :      908-903-1256

Please address all correspondence to:

          | Customer Number 22897 |

Jason Paul DeMont
DeMont & Breyer, L I C
P.O. Box 437
Basking Ridge, NJ 07920-0437
908-903-1255

- 2 of 2 -

6816457



Fig. 1

Fig. 2

FIG. 3

A.A. BAHATTAB 1



HIT RATIO

SIZE OF
ROUTING TABLE
CACHE

FIG. 4



AVERAGE
SEARCH TIME

SIZE OF
ROUTING TABLE
CACHE

FIG. 5

A. A. BAHATTAB 1



START

↓

INITIALIZE ROUTING TABLE CACHE — 501

↓

RECEIVE TEMPORAL SUCCESSION OF PACKETS, EACH OF WHICH COMPRISES A DESTINATION ADDRESS — 502

↓

RETRIEVE ROUTING INFORMATION FROM ROUTING TABLE CACHE, IF POSSIBLE, OR ROUTING TABLE, IF NECESSARY — 503

↓

TRANSMIT PACKET AND ROUTING INFORMATION TO SWITCHING FABRIC — 504

↓

COMPILE STATISTICS ON TEMPORAL SUCCESSION OF PACKETS — 505

↓

PERIODICALLY OR SPORADICALLY GENERATE TEMPORAL MODEL BASED ON TEMPORAL SUCCESSION OF PACKETS — 506

↓

PERIODICALLY OR SPORADICALLY REPOPULATE ROUTING TABLE CACHE BASED ON TEMPORAL MODEL AND ROUTING TABLE — 507

Fig. 6

M. A. Bahattab 1



FROM STEP 505

MODEL BUILDING

SEGREGATION STAGE ~601

DETERMINATION STAGE ~602

506

TO STEP 507

Serial No. Not Yet Assigned



A.A. Bahattab 1

# IN THE UNITED STATES
# PATENT AND TRADEMARK OFFICE

**Patent Application**

| | | |
|---|---|---|
| **Inventors:** | Abdullah Ali Bahattab | |
| **Case:** | 1 | |
| **Serial No.:** | Not Yet Assigned | |
| **Filing Date:** | 08/07/00 | |
| **Examiner:** | Not Yet Assigned | |
| **Group Art Unit:** | Not Yet Assigned | |
| **Title:** | Predictive Routing Table Cache Population | |

> "Express Mail" mailing label number EK594326170US;
> Date of Deposit: August 7, 2000.
>
> I hereby certify that this application is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" service under 37 CFR 1.10 on the date indicated above and is addressed to "Box PATENT APPLICATION, Assistant Commissioner of Patents, Washington, D.C. 20231"
> Jason Paul DeMont

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

SIR:

## INFORMATION DISCLOSURE STATEMENT

In accordance with 37 CFR 1.97(b), the enclosed Information Disclosure Statement, with attached reference(s), is submitted for consideration in the above-identified application.

Copies of the listed documents are enclosed.

NO FEE IS REQUIRED

In the event of non-payment or improper payment of a required fee, the Commissioner is authorized to charge or credit **Jason Paul DeMont Deposit Acount No. 50-1045** as required to correct the error.

Pursuant to 37 C.F.R. 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as incorporating a petition for extension of time for the appropriate length of time.

Respectfully,

By _____
Jason Paul DeMont
Attorney for Applicants
Reg. No. 35,793
908-903-1255

Date: August 7, 2000
DeMont & Breyer, L.L.C.
P.O. Box 437
Basking Ridge, NJ 07920-0437

- 1 of 1 -

PTO-1449 (Substitute)

| | Case: 1 | Serial No. NYA |
|---|---|---|
| INFORMATION DISCLOSURE STATEMENT | Applicant: A.A. Bahattab | |
| | Filing Date: 8/7/00 | Group: NYA |

Examiner: Initial box if reference is considered, whether or not citation is in conformance with MPEP 609. Draw a line through citation if not in conformance and not considered. Include a copy of this form with next communication to applicant.

### U.S. PATENT DOCUMENTS

☐ AA:

☐ AB:

☐ AC:

### FOREIGN PATENT DOCUMENTS

☐ AL:

☐ AM:

☐ AN:

### OTHER DOCUMENTS

☑ AR: "Improving Gateway Performance With A Routing-Table Cache," D C Feldmeier, IEEE CH2534-6/88/0000-0298 (1988)

☑ AS: "Improving the Routing and Addressing of IP," Peter Ford et al , IEEE Network, 0890-8044/92 (May 1993)

☐ AT:

Att: References as noted above

| Examiner: | Date Considered: 12/11/2003 |
|---|---|



jc813 U.S. PTO
09/633754

08/07/00



# IMPROVING GATEWAY PERFORMANCE WITH A ROUTING-TABLE CACHE

David C. Feldmeier
Massachusetts Institute of Technology
Laboratory for Computer Science
Cambridge, Ma 02139

## Abstract

A way to increase gateway throughput is to reduce the routing-table lookup time per packet. A routing-table cache can be used to reduce the average lookup time per packet and the purpose of this paper is to determine the best management policies for this cache as well as its measured performance. The performance results of simulated caches for a gateway at MIT are presented. These results include the probability of reference versus previous access time, cache hit ratios, and the number of packets between cache misses. A simple, conservative analysis using the presented measurements shows that current gateway routing-table lookup time could be reduced by up to 65%.

## 1. Introduction

A gateway is a device that connects two or more heterogeneous networks and is responsible for transporting packets among them, assuring that packets arriving from one network are retransmitted toward their ultimate destination. Any gateway that is not directly connected to the destination must send the packet to the next gateway in the chain from source to destination; the address of this next gateway is the next-hop address. The gateway examines the destination address of a received packet and determines the next hop address by using the destination address as an index to a *routing table*. A routing table is a table of destination/next-hop address pairs that is maintained by the gateway. A routing-table lookup converts an internet destination address into a local network address. If the packet destination is on the same network as the source, then the next-hop is the local network address of the destination. Otherwise, the next-hop is the local network address of the next gateway that brings the packet closer to its final destination. The gateways used in this study forward TCP/IP packets.

The routing-table lookup is a time-consuming process of packet forwarding. Routing-table caching of destination/next-hop address pairs will decrease the average processing time per packet if locality exists for packet addresses. Therefore, gateway throughput can be increased if internet address locality exists and earlier measurements suggest that this is likely. The purpose of this research is to determine whether internet address caching in gateways is effective and what type of cache performs best. This research simulates the performance of several routing-table caches in a busy gateway, using recorded gateway traffic to drive the simulation. The following sections include a discussion of the cache simulation models, the collection of data that drive the cache simulation, the simulation results and analysis, a cache performance analysis, and conclusions.

## 2. Data Generation

The method used for generating data to determine the effectiveness of routing-table caching is *trace-driven simulation*. A trace is gathered for an operating gateway by recording every routing table reference during normal gateway operation. This trace is then used to drive a cache simulation model. The cache model can be altered to simulate a cache of any type and size, and the simulation can be repeated on the same data set.

### 2.1. Cache Modeling

#### 2.1.1. Cache Location

Determining the next-hop address of a packet based on its destination address is more complex than a simple routing-table access on current gateways. Currently, routing is based on a hierarchical addressing scheme, which means that some part of the destination address contains information about what network the destination host is on. The routing table contains information only about the next hop to reach a given network, rather than a given destination. Before the routing table is used, the network address for the destination must be extracted from the destination address. The decoding of the destination address into a network address and a host address is non-trivial because the network address may be encoded in the destination address in many different ways.

Two possible positions for a cache are before the address decoder or between the address decoder and the routing table. The advantage of placing a cache before the address decoder is that destination addresses found in the cache need never be processed by the decoder. The disadvantage is that for a hierarchical addressing scheme, the number of addresses exceeds the number of networks,

**3D.1.1.**

0298                CH2534-6/88/0000-0298 $1.00 © 1988 IEEE

so for a cache of fixed size, the cache performance for the full address must be no better than the performance of a cache for the network part of the address. The choice of cache location is determined by the relative cache performance for flat and hierarchical addresses and by the time required for address decoding. In fact, some simple pre-processing of the destination address in such a way that does not affect address decoding may increase the performance of the cache placed before the address decoder at relatively little cost. The cache/pre-processor combination before the address decoder may offer the best overall performance

### 2.1.2. Cache Simulation

A routing-table cache differs from a main memory cache in several ways. A main-memory cache is bidirectional - it must be able to handle both read and write commands from the processor. A routing-table cache is unidirectional, because the packet-forwarding process only reads from the table. Read-only operation eliminates the need for routing-table update from the cache and simplifies cache operation. Another difference is that on a network with dynamic routing, the routing table changes over time. If the routing table changes, those entries in the cache may become inconsistent with the routing table. The cache model assumes that the cache is never flushed, which approximates true cache operation if the routing table is quasi-static or there exists an inexpensive method of updating the cache. Current gateway routing tables are relatively static, so never flushing the cache approximates cache performance on current gateways.

Different types of caches will behave differently with the same data set, so a type of cache to simulate must be chosen. A routing-table cache is defined by its associativity, replacement, and prefetch strategies, as well as size. Each of these must be defined for the simulation model

The associativity of a cache ranges from fully associative to direct mapped. Fully associative caches allow any destination/next-hop pair to be stored in any cache location. A direct-mapped cache allows each destination/next-hop pair to be stored in only a certain cache location, so multiple destination addresses are mapped into a single cache location. In general, the cache is divided into a disjoint set of locations that may contain the contents of a certain subset of destination/next-hop pairs, and this is a set-associative cache. For these measurements, a fully associative cache is used because it provides the best performance for a given number of cache slots. Also, the performance of any set-associative cache depends on the value of those items to be stored in the cache and the cache association mechanism. A fully-associative cache avoids the problem of measurement bias because of specific network addresses in the measurements and makes the results general for any set of network addresses with similar characteristics. In addition, broad associative searches are easily implemented in MOS VLSI, so it is reasonable to expect that highly associative caches will be available on a chip[1]

Whenever there is a cache miss, the missed entry must be entered into the cache and some other item must be discarded. The three most popular strategies are random replacement, first-in first-out (FIFO), and least recent use (LRU). A random replacement strategy simply discards a random location in the cache. The "random" location is most easily chosen based on some counter value (such as a clock) from elsewhere in the system. A FIFO replacement strategy discards the cache entry that is the oldest; a FIFO cache is easily implemented as a circular buffer. The most complex strategy, but also the one that generally provides the best cache performance, is LRU. An LRU cache operates by storing not only the data, but also the time that each datum was last referenced. If a reference is in the cache, its time is updated; otherwise the data that was least recently accessed is discarded and the data for the new reference is cached.

An LRU cache is a good choice for the type of address locality expected and a fully-associative, LRU cache forms an upper-bound on the cache hit ratio for a fixed number of cache slots. Unfortunately, this type of cache is also the most complex and expensive to implement. A different type of cache may perform worse for a given number of slots, but for a fixed price, a less efficient cache can afford to have more slots and perhaps exceed the performance of a smaller fully-associative LRU cache; this is a cost trade-off that only the gateway designer can assess.

A strategy for prefetching is suggested by observing that a packet from host A to host B is often followed by a packet from B to A[2]. If the cache prefetches the next-hop for the packet source, then a packet traveling through the same gateway in the reverse direction no longer causes a cache miss. For the cache simulations, two situations are analyzed. The first is that only the packet destination is used to update the cache and this corresponds to a case where prefetching is not economical. The second assumes that prefetching is free and should be done any time that the packet source is not in the cache. In reality, the truth is somewhere in-between, so these two sets of curves give lower and upper bounds for fully associative LRU caches where prefetching occurs.

## 2.2. Trace Generation

We would like to estimate the performance of a gateway with a routing-table cache before the system is built. The performance can be determined by trace-driven simulation, which requires a list of all routing-table accesses on a gateway. We are interested in statistics of packet arrivals at various gateways, but building a measurement system directly into a gateway has several disadvantages. The main problem is that each gateway would need to be reprogrammed to include a monitoring system. Reprogramming is difficult because some of the gateways are owned by other research groups, which are reluctant to disturb gateway operation; other gateways are commercial products, in which case the source code is unavailable. In addition, any monitoring system installed in a gateway will use processor time and memory space and this overhead could affect gateway operation during periods of heavy

3D.1.2.

load, causing packets to be dropped. Since periods of heavy load are of particular interest to determine the efficiency of the caching system, the measurement artifact of such a monitoring program is unacceptable. Also, it is advantageous to be able to try various caching strategies and cache sizes on a single measurement set, so that differences in results are directly attributable to the change in strategy, rather than simply a change in the gateway traffic. Instead of monitoring the packet arrivals at each gateway, it is simpler to measure all of the packets on the network that pass through the gateway. This replaces monitoring programs in each gateway with a single dedicated monitoring system.

Trace-driven simulation computes the exact cache performance as long as the trace-gathering operation is exact and has no processing cost. Measuring packets on the network with a separate measurement system assures that the gateway itself operates as usual. Two types of packets are observed traveling to a gateway: packets to be forwarded to another network or packets destined to the gateway itself. Not all packets addressed to the gateway itself are observed, since only one of the networks attached to the gateway is monitored, but this is a problem only if a packet to a gateway causes a routing table reference. Whether a packet to a gateway causes a routing table reference depends on the gateway implementation. One possibility is to explicitly check each incoming packet against a table of all of the gateway's addresses to see if there is a match. This explicit check means that the routing table is never consulted about packets destined to the gateway. Another possibility is to use the routing table for all packets. The gateway will discover that it is directly connected to the proper network and will try to send the packet. Before the packet is sent, the gateway checks if the packet is to its own address on the appropriate network. If the packet is for the gateway, then it is never transmitted. The explicit check after the routing-table lookup requires checking a smaller number of gateway addresses at the increased cost of a routing-table lookup. For this paper, it is assumed that gateways do an explicit address check and that the unobserved packets do not cause routing-table accesses.

Another disadvantage of measuring all packets is that the packets on the network to (or from) a gateway may not be the same as those to be handled by the gateway software. If the current gateway drops a packet, some protocols will retransmit that packet. Thus our packet trace now has multiple copies of a single packet, only one of which is actually forwarded by the gateway. Some of these extraneous packets can be eliminated by filtering the packet trace to remove identical packets with close interarrival times. In any case, these duplicate packets should only appear when the gateway is overloaded, and this is relatively rare.

The measurement system on the token ring is a general measurement system for monitoring all traffic and was originally built for the research done by Feldmeier[3]. The monitoring system consists of two computers - a passive monitor and a data analysis machine. The passive monitor receives the packets on the ring and timestamps them upon arrival. The passive monitor then compresses

The measurement system on the token ring is a general measurement system for monitoring all traffic and was originally built for the research done by Feldmeier[3]. The monitoring system consists of two computers - a passive monitor and a data analysis machine. The passive monitor receives the packets on the ring and timestamps them upon arrival. The passive monitor then compresses the information of interest from each packet into a large data packet that is sent to the analysis machine. The monitoring system generates less than 2% of the network traffic, so the monitoring overhead is acceptable; also, none of the packets pass through a gateway, so the arrival order of packets at a gateway remains unchanged. A more complete description of the design of the network monitoring station may be found in a paper by Feldmeier[4]. For these measurements, the monitor compresses information only for packets that are to or from non-local hosts; in other words, all the packets that pass through the gateways. The analysis machine simply stores all of the received data for later analysis.

Only a single trace using complete internet addresses for all packets through the gateway is needed for both flat and hierarchical addressing scheme cache simulation. Flat addressing measurements use the entire internet address for the cache simulation; hierarchical addressing uses only the network field of the internet addresses for the cache simulation.

## 2.3. Data Analysis
The measurements used in this paper are from the MIT ARPANET gateway. This is the main ARPANET connection to MIT and it serves the entire campus and several local companies involved in research as well. The ARPANET gateway processed 2,147,956 packets during the 24 hour measurement period. About 91% of all packets passing through the ARPANET gateway are part of virtual circuit connections (TCP protocol). The other interface of the ARPANET gateway is attached to a 10 Mbps token ring at the MIT LCS. In addition to 8 gateways, 20 computers also reside on the ring, including 10 VAXs, 7 PCs, a microVAX, an IBM-4341, and a PDP-11/45. The total number of packets processed by all gateways during a 24 hour period was 4,546,766. The ring itself carried 4,819,189 packets.

The results in this paper are based on network measurements made during the 24 hour period from 1:00 AM Monday, November 30th to 1:00 AM Tuesday, December 1st 1987. It is for this data that cache performance is evaluated; however any cache must start with no data and each cache reference that initializes the cache causes a cache miss. Since the reason for installing a cache in a gateway is to improve long-term average performance of the system, we are interested in the steady-state cache performance. To avoid cache misses caused by cache initialization, the cache is pre-loaded so that once the measurement period begins, the cache has many of its most referenced entries. Measurements during the 61 minute period from 11:59 PM Sunday, November 29th to 1:00 AM on Monday, November 30th 1987 were used to pre-load the cache to avoid measurements during cache initialization. During cache initialization, 230 distinct destination addresses and 254

**3D.1.3.**

0300

distinct destination and source addresses arrived, out of 44,284 packets. Although a longer cache initialization would increase the cache performance, there is a limit to the amount of data storable by the network measurement system.

As mentioned above, the monitor cannot receive packets addressed to the gateway or broadcast packets from other networks, and it is assumed that these packets do not cause routing table accesses. Any packets of these types received on the monitored network are ignored in the data analysis.

As with any measurement, the data collected is not as precise as we would like. Because a machine could not be dedicated to the receiving of data from the network monitor, a time-sharing machine was used instead. The monitor transmits each packet to the analyzer once to minimize network loading, and if the receiving machine is occupied with other network functions at that time, the monitoring data are lost. During the course of monitoring, data were lost for 0.33% of packets passing through gateways on the ring.

Another source of measurement inaccuracies is caused by low-level retransmissions. As mentioned above, not all packets on the network are seen by the intended receiver. To assure more reliable packet transmission, the ring has a low-level acknowledgment system built into the network hardware; if an interface receives a packet, an acknowledgment bit in the packet trailer is marked. Since the transmitter must remove any packets that it transmits on the ring, the transmitter always can determine whether the packet it has sent was received by checking for the receiver's mark. The device drivers for hosts on the ring include a low-level retransmit mechanism that automatically retransmits a packet up to eight times without higher-level intervention if the receiver has not acknowledged the packet by marking it. This means that several closely-spaced identical packets may be retransmitted, but only a single packet is received by the intended host. The monitoring station is fast enough to receive all of the packets present in a burst, but the receiver itself receives only one of them. The monitoring station cannot check the acknowledgment bit, so somehow these retransmissions must be removed from the data so that the time locality of the data will not be exaggerated. Since a low-level packet burst at high speed, any packets with the same source and destination address that arrive within a short time of each other should be discarded; however, if this threshold is set too high, multiple packets between a host-destination pair may be incorrectly eliminated. The specific value that determines whether a packet is caused by a low-level retransmission depends on parameters of the network and the network hosts. Also, the threshold should exceed the transmission time of most packets. Most packets on the ring are 576 bytes or less long, and at 10 MBPS the transmission time is 461 microseconds.

The graph in figure 2-1 is a histogram of the interpacket arrival times for packets to all gateways with identical source and destination addresses, from 0 to 5 milliseconds with a clock granularity of 25 microseconds. There is a peak around 725 microseconds,



**Figure 2-1:** Interpacket Arrival Time of Identically Addressed Packets

and this is where most of the low-level retransmission must occur. The higher the low-level retransmission detection threshold is set, the more low-level retransmissions that are eliminated. However, the upper bound of this threshold is set by the interpacket time for the fastest host on the network. Since a gateway can transmit over 700 packets per second, the interpacket time of 1.35 milliseconds (the peak around 2% of all packets) is probably caused by a gateway transmission. For this data, any packets with the same source and destination that arrive within a millisecond or less of each other are discarded as low-level retransmissions.

## 3. Measurement Results

Although hierarchical addressing is relevant to existing gateways, the behavior of the cache under a flat addressing scheme is more easily understood because the performance of the cache can be understood in terms of various packet flows among hosts. It is also of interest to learn whether flat addressing can be done efficiently with a cache. Hierarchical addressing requires that many flat addresses are mapped to the same network address. Hierarchical addressing involves an understanding of a conglomerate of host flows seen as network flows.

### 3.1. Results for Flat Addresses

From a previous study, it is known that a packet from host A to host B has a high probability of being followed by another packet from A to B[2], which implies time locality of packet addresses. Consider a time-ordered list of previously seen addresses; for a current address that has been previously seen, how far down the list is this address? Figure 3-1 shows the percentage of references versus time-ordered position of previous reference for the 400 most recently referenced packet destination addresses. The graph is averaged over all packets received by the gateway and it is plotted on a logarithmic scale so that the relative popularity of the slots is more easily seen. The graph for destination/source caching is similar.

**3D.1.4.**

0301

**Figure 3-1:** Percentage of Reference versus Time of Last Reference (Destination)

The decrease in probability for both graphs is nearly monotonic until about 50 most recently referenced addresses. This monotonically decreasing function implies that the LRU cache management strategy is optimal for caches of less than 50 slots. After reference 50, the probability continues to decrease generally, but there is more variance. One reason for the increased variance is that the probability of reference decreases with increasing age, so that the amount of data that falls into the farther positions is too small to properly approximate the probability distribution curve at these points. At these outer parts of the curve, the average number of packets per slot is about 15, as compared to between 500 and 876,000 in the first 50 positions. Another explanation is that the relationship between probability of reference and time of last reference changes at some point on the curve. This change in relationship might be caused by two separate mechanisms that determine whether the current packet address is in the cache.

The first mechanism that produces cache hits is a current packet that is part of a train of packets. The first packet of the train initializes the cache and as long as the cache is not too small, all following packets are cache hits. The second mechanism is that the first packet of a train is to a destination already in the cache. If N is the number of packets in a train[*], the number of packets that arrive due to the first mechanism must be greater than N-1 times the number of packets that arrive due to the second mechanism[**]. This means that the destination addresses of packets in an active train are most likely to be near the first slot of an LRU cache and that addresses of inactive but popular train destinations are likely to be between slot *i*, where *i* is the number of simultaneously active trains, and the last slot of the cache. The relationship among train arrivals at a destination is

unknown, but undoubtedly it is weaker than the relationship among packets in a train, and this could explain the higher variance in the later part of the probability distribution. Additional information is necessary to decide whether an insufficient number of samples or two cache hit mechanisms more correctly explains the increased variance in the later part of the probability distribution above.

If the probability distribution does change with age after a certain point, the most cost-effective strategy may be to have an LRU cache with 50 slots, followed by a FIFO or random management cache with a few hundred slots. If the probability of reference does not decrease monotonically with increasing last-reference age, then an LRU cache decreases in efficiency relative to other cache types and its higher cost may not be justified because other cache types allow a larger cache for the same price and perhaps a higher cache hit ratio for a given cost.

Given the data above, an LRU cache should be effective for reducing the number of routing-table references. The probability of reference versus time of previous reference data allows simple calculation of an LRU cache hit ratio for a given number of cache slots. The relationship between cache hit ratio and probability of access is:

$$f_h(i) = \sum_{j=1}^{i} p_j$$

Where $f_h(i)$ is the cache hit ratio as a function of *i*, the number of cache slots; and $p_j$ is the probability of a packet address being the $j^{th}$ previous reference. Figure 3-2 shows the percentage of cache hits versus cache size for both destination and destination/source caches. Notice that even a relatively small cache has a high cache hit ratio. Table 3-1 shows just how quickly the probability of a cache hit climbs even for small cache sizes. With as few as 9 slots, the hit ratio is already above 0.9.

[*]Jain and Routhier claim the average number of packets in a train is 17.4[2].

[**]For a cache large enough to hold entries for all simultaneous trains.

**3D.1.5.**

0302



**Figure 3-2:** Percentage of Cache Hits versus Cache Size

**Table 3-1:** Cache Hit Ratio Percentage versus Cache Size

| Number of Cache Slots | Destination Only | Destination Source |
|---|---|---|
| 1 | 40.78 | 27.05 |
| 2 | 63.53 | 67.83 |
| 3 | 72.34 | 76.30 |
| 4 | 78.19 | 82.12 |
| 5 | 81.96 | 85.34 |
| 6 | 84.78 | 87.44 |
| 7 | 86.95 | 89.15 |
| 8 | 88.72 | 90.48 |
| 9 | 90.17 | 91.57 |
| 10 | 91.37 | 92.52 |
| 11 | 92.38 | 93.30 |
| 12 | 93.22 | 93.97 |
| 13 | 93.92 | 94.54 |
| 14 | 94.52 | 95.05 |
| 15 | 95.02 | 95.48 |
| 16 | 95.45 | 95.87 |
| 17 | 95.82 | 96.19 |
| 18 | 96.13 | 96.47 |
| 19 | 96.40 | 96.73 |
| 20 | 96.64 | 96.96 |

Another way of looking at the hit ratio data is to plot the average number of packets through the gateway between cache misses. The relation between cache hit ratio and packets between cache misses is:

$$f_m(i) = \frac{1}{1 - f_h(i)}$$

Where $f_m(i)$ is the number of packets between cache misses as a function of $i$, the number of cache slots; and $f_h(i)$ is the probability of a cache hit as a function of the number of cache slots.

The effectiveness of a cache depends on the ratio of the packets-between-misses values before and after the cache, not an absolute number, so the graph in figure 3-3 is plotted on a logarithmic scale so that equal ratios appear as equal vertical intervals. This graph shows the incremental efficiency of each additional slot in the cache. In addition to curves for destination LRU, destination/source LRU, destination FIFO, and destination/source FIFO, also shown are the destination and destination/source curves for a two cache system consisting of a 64 slot LRU cache followed by a FIFO cache.

As expected, the destination/source LRU cache performed best, followed closely by the destination LRU cache. The destination/source cache outperforms the destination only cache, which confirms that much of the traffic through the gateway is bidirectional. Performance of both FIFO caches is relatively poor until the destination FIFO cache size exceeds 1250. It turns out that 1035 is the number of distinct destination addresses handled by the gateway in a 24 hour period, in addition to 230 destinations in the preload, for a total of 1265. For destination/source caching, the FIFO buffer size does not help until 1370 slots, which is about the number of distinct destination and source addresses processed by the gateway in a 24 hour period, 1130, plus 254 during preload for a total of 1384.

The incremental efficiency of each slot in the cache is the slope of the curve at that slot number. A sharp decrease in the slope indicate a point of diminishing returns for larger cache sizes. Particularly notice the drop in LRU cache efficiency around cache slot 50.

The dual cache systems perform moderately well. For example, consider a 128 slot destination LRU cache (this can be thought of as two 64 slot LRU caches back to back). The same performance can be obtained with a 64 slot destination LRU cache followed by a 241 slot destination FIFO cache. A FIFO cache is simpler to implement than an LRU cache and if an 241 slot FIFO cache is cheaper than a 64 slot LRU cache, then the dual cache combination provides a better hit ratio for a given cost than a single LRU cache.

If the interest is in determining how many cache slots are necessary for a given number of packets between cache misses, the above graph is better plotted on a linear scale. The graph in figure 3-4 is interesting because each of the curves seems to be composed of two or three linear regions. At least for the LRU curves, the number of packet between misses seems proportional to the number of cache slots, until the curve approaches its maximum, where the incremental slot efficiency drops.

**3D.1.6.**

0303



Figure 3-3:   Number of Packets Between Cache Misses versus Cache Size (log-linear)



Figure 3-4:   Number of Packets Between Cache Misses versus Cache Size (linear-linear)

## 3.2. Results for Hierarchical Addressing

Although in the previous section packet addresses were treated as flat addresses, in reality they are hierarchical addresses, which means that an address can be separated into network and host pieces. Currently, routing is done based on network addresses and since the number of networks is smaller than the number of hosts, the cache hit ratio for a network cache is higher than the hit ratio of a flat address cache.   In order to cache network addresses, the complete address must pass through an

3D.1.7

address decoder that extracts the network address. The tradeoff is that the hit ratio of the cache is higher than for flat addresses, but each address must be decoded.

Hierarchical addressing, as done by current gateways, is complex because the separation of the network and host fields of the internet address is determined by the type of address. In order to avoid this complication, the separation of fields for the purposes of this research is that the first three bytes of the full address refer to the network and that the last byte refers to the host. This procedure never removes part of the network address as long as the address is not a class C address with subnetting (which is not known to be used by anyone). In some cases, some of the host's address will be left with the network address, which means that the cache hit ratio will be lower than if the address were completely separated

Since the purpose of a cache is to speed up routing table access, it is probably advantageous to place the cache before the address separation, rather than after it, so that each cache hit saves not only a table lookup, but also the trouble of dissecting the full address. It may be advantageous to use a simple address separation procedure before the cache, such as the suggested one of removing the last byte of the address. This preprocessing step increases the cache hit ratio by eliminating most, if not all, of the host address from the full address, and yet avoids the complexity of complete address decoding.

Figure 3-5 shows the percentage of references versus time-ordered position of previous reference for the 80 most recently referenced packet destination addresses. The graph is averaged over all packets received by the gateway and it is plotted on a logarithmic scale so that the relative popularity of the slots is more easily seen. The graph for destination/source caching is similar.

Figure 3-6 shows the percentage of cache hits versus cache size for both destination and destination/source caches. Notice that even a relatively small cache has a high cache hit ratio. Table 3-2 shows just how quickly the probability of a cache hit climbs even for small cache sizes. With as few as 7 slots, the hit ratio is already above 0.9.



**Figure 3-6:** Percentage of Cache Hits versus Cache Size

Another way of looking at this data is to plot the average number of packets through the gateway between cache misses. The graph in figure 3-7 shows the incremental efficiency of each additional slot in the cache. Curves are shown for destination LRU, destination/source LRU, destination FIFO, and destination/source FIFO.

As expected, the destination/source LRU cache performed best, followed closely by the destination LRU cache. Performance of both FIFO caches is relatively poor until the destination FIFO cache size exceeds 102. It turns out that 52 is the number of distinct destination addresses handled by the gateway in a 24 hour period, in addition to 52 destinations in the preload, for a total of 104. For destination/source caching, the FIFO buffer



**Figure 3-5:** Percentage of Reference versus Time of Last Reference (Destination)

**3D.1.8.**



**Figure 3-7:** Number of Packets Between Cache Misses versus Cache Size (log-linear)

size does not help until 104 slots, which is about the number of distinct destination and source addresses processed by the gateway in a 24 hour period, 54 plus 53 during preload for a total of 107.

**Table 3-2:** Cache Hit Ratio Percentage versus Cache Size

| Number of Cache Slots | Destination Only | Destination Source |
|---|---|---|
| 1 | 42.31 | 29.94 |
| 2 | 66.54 | 71.28 |
| 3 | 76.03 | 80.81 |
| 4 | 82.52 | 86.32 |
| 5 | 86.61 | 89.61 |
| 6 | 89.53 | 91.81 |
| 7 | 91.74 | 93.48 |
| 8 | 93.44 | 94.76 |
| 9 | 94.75 | 95.77 |
| 10 | 95.77 | 96.56 |

## 4. Caching Cost Analysis

Although the hit ratios have been given for various gateway caches, the important question is what is the performance improvement that is gained for the gateway. The following analysis is meant to be a simple worst-case analysis. The cache used for this analysis is a fully associative cache with a LRU replacement policy. The cache is implemented completely in software as a doubly-linked linear list. The list is searched linearly from most recently used to least recently used and when the list is rearranged to preserve the LRU ordering, this is done by swapping pointers of the doubly-linked list. Only destination addresses are cached.

Estimates of the number of instructions are based on a load-store machine architecture. Loading the pointer to the cache requires 1 instruction. A matching entry is recognized in 3 instructions; in addition, 7 instructions are needed for each previously checked cache slot. After each cache search, the cache must be reordered to preserve the LRU ordering (except if the entry was found in the first slot) and this takes 21 instructions (except for the last cache slot, which needs 11 instructions).

An estimate of the minimum-time address decode and routing table lookup for a packet is 80 instructions, a figure obtained by estimating the number of load-store instructions generated by the C gateway code at MIT. The current gateway code would take even longer; this estimate is conservative because it does not include function call overhead, error handling, or the additional routing table lookup necessary for subnet routing and assumes that there are no hashing collisions. This estimate also does not include the time necessary to map a next-hop IP address into a local network address, which is at least 2 instructions, but varies depending on the local network.

The average lookup time with the cache is now:

$$1 + 3p_1 + (7+3+21)p_2 + (14+3+21)p_3$$
$$+ \cdots + (7[k-1]+3+21)p_k$$
$$+ \cdots + (7[n-1]+3+11)p_n$$
$$+ (1 - \sum_{i=1}^{n} p_i)(7n+21+80)$$

If the cache stores flat addresses and destinations only, then the optimum number of cache slots is 16. The average lookup time with the cache becomes 37.9 instructions, only 47% as long as a table lookup. One problem with LRU caches is that it is expensive to maintain LRU ordering. A way to reduce this expense is to use only two entries and a single bit to determine

**3D.1.9.**

which is first in order. In this case, the average lookup time is 33.9 instructions, 42% as long as table lookup. For a source-destination two-element cache, the average lookup time is 29.6 instructions or 37% of table lookup.

With hierarchical addressing, the performance is even better. To obtain a network address from a flat address, the last byte is dropped from the address. Although this does not necessarily result in a network address, the number of distinct addresses that the cache must handle is reduced and the overhead is only a single AND instruction. The optimal cache size is 51 slots and the average lookup time is 31.5 instructions, 39% as long as table lookup. A two element simple cache as described above averages 33.3 instruction, 42% of a table lookup. A source-destination cache requires 27.7 instructions, or 35% of a table lookup.

Although the figures above minimize average lookup time, it may be that a lower maximum lookup time is desired at the cost of a slightly higher average lookup time.

Obviously, a better cache implementation would increase performance. Cache lookup could use a hash table rather than a linear search, the cache slots need not be fully associative, a replacement strategy approximating LRU may be implemented less expensively, the cache fetch strategy could use both destination and source addresses, or a hardware cache could be built into the system. But even with this simple cache implementation and optimistic assumptions about routing-table lookup time, the best cache above reduces lookup time by 65%.

## 5. Conclusion

Processing time per packet is reduced if average routing-table access time is reduced, and an economical way to reduce access time is to use a cache. Recordings were made of routing-table accesses for several operating gateways and these records are used to drive cache simulations to determine the hit ratio for various types of caches. The caches simulated are fully-associative, LRU or FIFO, and cached destination addresses or destination and source addresses.

The probability of reference to a destination address versus time of previous reference to that address is monotonically decreasing for up to 50 previous references, implying that an LRU cache management procedure is optimal for caches of 50 slots or less.

Locality of packet flat addresses causes an LRU cache of 9 slots to have a hit ratio of over 90%. Hierarchical addressing measurements place hit ratios at over 90% for 7 slots.

In addition to caching the packet destination/next-hop pair, it is worth caching the packet source/next-hop pair if it can be done inexpensively.

The data indicate that back-to-back caches may be the most effective implementation of large caches. This first cache should have an LRU management policy to cache packets arriving in a train. Cache misses from this cache should then check a FIFO cache to check for trains from previously seen destinations.

Hierarchical addressing recognition allows a higher cache hit ratio at the expense of address decoding each packet destination address. Simple preprocessing before a cache for flat addresses provides a hit ratio not as high as that for hierarchical addressing, but higher than the hit ratio for flat addressing at little cost.

A simple conservative cost analysis shows that current gateway routing-table lookup time can be reduced to 35% of its current time. This is a conservative estimate and a good cache design or a hardware cache could further reduce the average lookup time.

The hit ratio for a flat address cache is high enough that flat addressing may be practical to use in a gateway with a cache.

## 6. Acknowledgments

I would like to thank Dave Clark for suggesting the idea of a routing-table cache in a gateway. My thanks also to Thu Nguyen and an anonymous reviewer for their comments.

## References

1.    Alan Jay Smith, "Cache Memories", *ACM Computing Surveys*, Vol. 14, No. 3, September 1982, pp. 473-530.

2.    R. Jain and S. Routhier, "Packet Trains - Measurements and a New Model for Computer Network Traffic", *IEEE Journal on Selected Areas in Communications*, Vol. SAC-4, No. 6, September 1986, pp. 986-995.

3.    David C. Feldmeier, "Traffic Measurements on a Token Ring Network", *Proceedings of the 1986 Computer Networking Symposium*, (Washington, DC, November 1986), pp. 236-243.

4.    David C. Feldmeier, "An Empirical Analysis of a Token Ring Network", Technical Memo TM-254, MIT Laboratory for Computer Science, January 1984.

**3D.1.10.**





# Improving the Routing and Addressing of IP

Simple mechanisms can introduce hierarchy into the interdomain
routing system and make a truly large Internet practical.

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

Peter S. Ford, Yakov Rekhter, and Hans-Werner Braun

The Internet has grown from a single community of interest network for the Defense Advanced Research Projects Agency's (DARPA) research community into an international network. Presently, it interconnects more than 50 countries, 10 000 networks, and 1.5 million host computers. The current routing and addressing structure does not adequately scale to meet the needs generated by the accelerated growth of the Internet.

This article details simple mechanisms for introducing hierarchy into the interdomain routing system, making it practical to route a truly large Internet. Addresses need to be assigned along network topological lines to maximize the reduction in routing overhead. Simplifying the mechanisms for changing host addresses makes it possible to renumber a network so that it has a topologically significant address when the site changes position within the routing system (e.g., changing network service providers). These proposals make it possible to significantly increase the utilization of addresses and extend the time the Internet can use the Internet Protocol (IP) Version 4 into the next century.

## IP Address Structure

The IP is a datagram protocol with 32-bit long source and destination addresses. IP addresses are commonly represented as dotted quads where each octet (eight bits) is represented as a decimal number and dots are used as octet separators.[1] IP addresses have a limited, fixed structure consisting of a network address and a host identifier, significant within that network. The boundary between the network address and the rest of the address is a fixed location determined by the leading bits of an address as shown in Fig. 1. There are three classes of IP unicast addresses — A, B, and C — with boundaries falling after the first, second, and third octets, respectively. A single Class A network may be used for a network of up to 16,777,216 hosts, a Class B network is used for up to 16,536 hosts, and a Class C network is used for less than 256 hosts.

Subnetting is a secondary structure commonly used within an IP network made up of several physical subnets, such as multiple local area networks. In a subnetted network, the boundary between the network address and host identification is shifted so that each physical subnet within the network is given an IP subnet number, which is a strict subset of the address range defined by the network, as Fig. 2 illustrates. A subnet boundary can be represented as a bit mask, written in dotted quad form (e.g., 255.255.248.0). Mask bits, with a value of one, select the bits that are the network address, including the subnet number, and the zero bits select for the host identifier significant within that network address. Since subnet boundaries cannot be inferred from looking at the address, systems that use subnet information must separately maintain subnet mask information. Subnet information is distributed and used within the IP network that is being subnetted, but it is not globally distributed. Currently, only IP network addresses falling within the A, B, and C class structure are distributed within the global Internet routing system.

## Routing

Routing in the Internet is organized into two parts: interdomain and intradomain routing.[2] IP routing domains are defined as a collection of hosts and routers under the control of a single administrative entity using a common routing system. Intradomain routing maintains connectivity between the elements within the domain using interior gateway protocols (IGPs) such as: OSPF [15], IGRP [8], RIP [7] and IS-IS [2,9]. Interdomain routing is performed between routing domains that agree to exchange routing information by peering with each other, using exterior gateway protocols. Most domains in the Internet are transitioning to the Border Gateway Protocol (BGP) [12] in place of the Exterior Gateway Protocol (EGP) [21].

The relationship between interdomain and intradomain routing can be illustrated in the current routing structure of the National Science Foundation's NSFNET shown in Fig 3. The example

PETER FORD is a member of the technical staff at Los Alamos National Laboratory.

YAKOV REKHTER is a research staff member at IBM and a manager of the high performance communication group at T. J. Watson Research Center.

HANS WERNER BRAUN is a principal scientist at the San Diego Supercomputer Center (SDSC).

[1] An IP address with the first 16 bits set to one is represented as the dotted quad 255.255.0.0.

[2] IP routing domains are often called Autonomous Systems [6]

0890-8044/92/$03.00 ©IEEE

| Date | IP networks |
|------|-------------|
| December 1988 | 224 |
| December 1989 | 1990 |
| December 1990 | 2190 |
| December 1991 | 4305 |
| December 1992 | 8561 |
| March 1993 | 10,057 |

■ **Table 1.** *IP network count by year.*



■ **Figure 1.** *Class structure of unicast IP addresses*



■ **Figure 2.** *Subnet structure of IP addresses*



■ **Figure 3.** *Hierarchical structure of the NSFNET.*

is simplified to emphasize the relationship of interdomain and intradomain routing. Each site on the NSFNET runs an IGP that routes between the networks within that site. Regional networks interconnect geographically proximate sites and maintain interdomain routing sessions with each of their members. Intradomain routing maintains connectivity within each regional. Regional networks use the BGP to peer with the NSFNET backbone network, which in turn runs its own intradomain routing.

The overall structure of the NSFNET is hierarchical and is exploited to greatly simplify the routing by its constituent networks. Sites only need to maintain routing information for their networks, and a default route to the regional to which they are attached for network traffic that goes off-site. Regionals follow a similar strategy, maintaining routes to their member sites and using a default route to the NSFNET backbone for traffic that transits the backbone. The NSFNET backbone maintains routing information for all sites and regional networks. The Internet is composed of several similarly hierarchical networks that interconnect and peer with each other.

Only a few domains require full routing information of the Internet. Since the current IP routing system maintains explicit routing information for each IP network address, the amount of routing information in these top-level domains scales linearly with respect to the number of networks in the Internet. Routing domains are considered top-level if they maintain routing information to most sites on the Internet and operate without the use of default routes. There are at least five such top-level routing domains including, but not limited to, the NSFNET Backbone, the Commercial Internet eXchange (CIX), the NASA Science Internet (NSI), SprintLink, and the European IP Backbone (EBONE).

## Current Status of Routing

The Internet is the de facto network in support of the international research and education community. Over time, the Internet has evolved from serving this community to serving sites from all sectors. Table 1 provides a brief history of growth in the number of networks in the Internet. A rough estimate is that the number of connected networks is doubling every year.

Since its inception, the Internet has performed routing over the flat set of IP network addresses. Continued growth of the Internet requires managing scaling problems related to memory and computational overhead for routing information, bandwidth for routing information distribution, and the stability of distributed routing computations. The current system of flat interdomain routing by network number does not adequately scale in light of the Internet's continued growth. Current generation "off-the-shelf" IP routers may not have sufficient memory to handle the anticipated growth of the Internet during 1993 and 1994.

■ Figure 4. *Route aggregation at the GIX.*

There are many sites in the Internet subnetting of Class B network addresses to interconnect a large number of hosts with a complicated topology of physical subnets and routers. Since they are using a Class B network address, they only advertise a single routing entry into interdomain routing. At the current rate of allocation, the Class B address space will be exhausted in 1994. When this occurs, it will require the use of Class C addresses. Multiple Class C networks will now be to be used by sites with more than 254 hosts. If the Internet continues using flat interdomain routing, each Class C network will require a separate route entry — resulting in even faster growth of the Internet interdomain routing system.

Hierarchical routing has desirable scaling properties, but requires the use of hierarchical abstractions instead of individual IP network addresses for routing [10]. By assigning addresses in a hierarchical manner, the topology of the interdomain routing system can be efficiently encoded and used by the routing system. Router software will need to change to take advantage of the new routing abstraction, but these changes can be made transparent to host software.

## Routing on IP Address Prefixes

Classless interdomain routing (CIDR) is a minimal extension to IP interdomain routing [4]. Instead of using IP network addresses (that conform to IP address class structure) to identify reachable destinations, CIDR uses the concept of IP address prefixes. An IP address prefix is a string of up to 32 bits, and is represented as a tuple consisting of a 32-bit IP address and a bit mask. The bit mask specifies the contiguous leading bits in the address that are significant to Internet routing. IP prefixes are similar to IP subnets and are represented using the same tuple notation. The tuple < 128.0.0.0, 255.128.0.0 > represents an IP prefix that is nine bits long with a leading bit of one followed by eight zeroes. IP address prefixes are far more useful for interdomain routing since they can represent a power of two sized blocks of reachable destinations, while network numbers are only capable of representing 256 (Class C), 64,536 (Class B), or 16,777,216 (Class A) reachable destinations.

IP address prefixes provide hierarchical abstraction through a process known as summarization. A pair of prefixes of length $N$ can be summarized to a single prefix of length $N-1$ if the prefixes have the first $N-1$ bits in common (e.g., the prefixes 1010 and 1011 can be summarized to the prefix 101). This can be repeatedly applied so that a set of longer prefixes can be summarized into a single short prefix. Summarization is used to aggregate multiple routing entries into a single entry. If eight sites are attached to the same NSFNET regional, and are assigned IP addresses that are capable of being summarized, then the regional can advertise its reachability to these eight sites using a single IP address prefix. Route summarization permits recursive abstraction of the hierarchical structures in the interdomain routing system. As a result, the number of routing advertisements will scale much less than linearly with respect to the number of networks.

CIDR requires routing protocols to carry 32-bit prefix bit masks in addition to carrying 32-bit IP addresses. OSPF and RIP-2 [13] are capable of carrying masks, and BGP-4 [19] has been recently specified and is being implemented by router vendors with this capability. Initial deployment of CIDR is proposed for the Class C address space where IP prefixes will be aggregates or "supernets" of multiple contiguous Class C addresses. More than $10^9$ IP addresses are unused in the Class A address space alone. Once CIDR is fully deployed in the Internet, it can also be used in the Class A and B address spaces.

CIDR permits multiple levels of hierarchical summarization. The current CIDR addressing architecture specifies three levels in the routing hierarchy where summarization of network addresses can be done; additional levels can be added if needed [20].

The first level of summarization is done at the site level by aggregating all addresses at the site into a single routing prefix. The second level of summarization is by network service providers. The third, and top, level is at continental boundaries, where telecommunications infrastructure is topologically limited by transoceanic cables and satellite facilities. Service providers may operate out of several regions, but they should obtain addresses out of the prefixes for each of the continental regions they serve — to maximize the summarization capability for each region.

Ideally sites will get their IP addresses from the address space of their network service provider

(e.g., regionals). This will help minimize the number of routes being distributed in the global interdomain routing system. Network service providers only need to know routes to their own directly attached customers and other service providers, where a route to a provider can be represented by a single prefix. The size of interdomain routing will increase as sites switch providers or choose to attach to more than one provider in a multihomed configuration. Providers operating within a region will draw a prefix from continental prefixes [5, 20]. Providers may coordinate their intercontinental connectivity, which allows route summarization at the continental level. For example, a North American provider carries a small set of continentally-aggregated prefixes in its intradomain routing system for all European destined traffic. This scheme works best when network service providers from separate continents interconnect at global Internet exchanges (GIXs) [1]. Only routers at the global Internet exchanges are required to know the separate provider prefixes under the continental prefixes as is shown in Fig. 4. Continental aggregates control the propagation of additional prefixes that can come into being when a site chooses to switch providers or becomes multihomed.

## The Best Match is the Longest

While CIDR exploits hierarchical routing for the purposes of scaling, it does not mandate a strict routing hierarchy. During the process of forwarding an IP datagram, the destination address in the datagram is matched with candidate prefixes in a routing table to select where the datagram should be sent. The list of prefixes is sorted by length and searched in descending order so that the prefix with the longest match will identify the routing entry to be used.

As shown in Fig. 5, provider A has a prefix of < 198.1.0.0 255.255.0.0 >, provider B has a prefix of < 199.3.0.0, 255.255.0.0 > and site S has a prefix of < 198.1.8.0, 255.255.248.0> as a customer of A. Provider A advertises its connectivity to B using A's prefix which implicitly provides routing information for site S. Site S subsequently switches to using B for Internet services. B still learns A's prefix, but it also learns S's prefix since it now has a direct interdomain routing session with S. The intradomain routing system of B now contains two hierarchically related prefixes: A's prefix of < 198 1.0.0, 255.255.0.0 > and S's prefix of < 198.1.8.0, 255.255 248.0 >. When B needs to forward datagrams to IP addresses in S, it will use the routing information with the longest matching prefix. B will also advertise S's longer prefix into provider A so A's intradomain routing system will maintain an explicit route to S

## Names, Not Addresses. Are Permanent

Maximal use of a CIDR hierarchy requires the extra administrative effort of assigning addresses congruent to the interdomain routing topology of service providers. When a site switches to a new service provider, but keeps its old address, additional routing prefixes are advertised into the interdomain routing system. Over time this



■ **Figure 5.** *Longest match of IP prefixes.*

additional routing overhead can be reduced —provided host addresses within a site are changed so their routing prefix is hierarchically-related to the prefix of their new network service provider — as shown in Fig. 6. Observe that even without changing host addresses within a site, the extra routing overhead associated with switching providers can be constrained at higher levels of the hierarchy (e.g. the GIX).

To understand the implication of changing host addresses we need to observe that IP addresses are rarely explicitly used by Internet users as the same impact as changing telephone numbers. Most Internet users do not know the IP addresses of the hosts they use. Domain names provide handles for hosts that are opaque with respect to the Internet routing and addressing system [14]. Thus, electronic mail addresses such as john.doe@widget.com, will not change when Widget Inc. changes its network service provider. Applications such as virtual terminal access (e.g., Telnet, rlogin, X) and file transfer (FTP) will continue to use exactly the same names in spite of address changes.

In practice, changing IP addresses for all hosts at a site is tedious. IP hosts and routers often are manually configured and the current IP routing and addressing model does not contain sufficient support for automatic, easy-to-use methods for changing host addresses. The IP model for host addressing is that a host's interfaces are separately numbered, and it is a com-

mon assumption by IP implementations to assume that there is only one address per interface. Traffic through an interface is limited to the single IP address assigned to the interface. Assigning multiple IP addresses, per network interface, will greatly simplify changing host addresses. During transition hosts can simultaneously use their old and new IP addresses. All entities communicating with a host will eventually learn the new address from the DNS and eventually the old address will be retired. This reduces the need for synchronizing address changes. Enhancing IP implementations to allow assignment of more than one IP address to a given host interface is not required, but it would simplify automating the task and would be very useful for large sites facing renumbering.

The CIDR addressing and routing plan will sig-



■ **Figure 6.** *Renumbering hosts.*

nificantly reduce the routing overhead of the IP Internet. The current BGP routing tables in the interdomain routing system indicate that a CIDR addressing hierarchy is capable of routing the current set of 10,000 networks with fewer than 200 routing entries. Changing host addresses of sites currently in the Internet would be needed to make these reductions possible.

## Utilization of the IP Address Space

There are two critical, interrelated resources in the Internet routing and addressing system: routing resources (memory, network bandwidth, and computational power) and IP address space. In the past, IP address space has been freely traded off for the sake of making routing easier. Sites with a few hundred hosts could have used a couple of Class C networks, but it has been simpler to give those sites a single Class B network and advertise only one network address into the routing system. With CIDR, it is possible to allocate sufficient address space (such as four contiguous Class C networks) to the same site and summarize to a single routing advertisement. Thus, the number of IP addresses assigned is more closely tied to the actual number of hosts.

Class B addresses are capable of identifying 65,536 IP hosts. A survey of the Domain Name System reveals that *more* than 50 percent of Class B networks in the Internet have *fewer* than 50 hosts [11]. Networks with fewer than 50 hosts can easily operate within a single Class C network address. Changing host addresses at these sites would reclaim a substantial amount of unused IP address space. An additional benefit is that the new addresses could be summarized within a provider's prefix. Each site that renumbers in this manner will reduce the size of interdomain routing tables.

Many networks use a single subnet mask within an IP network since most IP implementations work best this way. Administratively it is much easier to keep track of fixed boundaries. A common example is where a site will split a Class B address into 255 subnets using a subnet mask of 255.255.255.0. Significant address space goes unused since few networks have an even distribution of hosts across physical subnets, and the subnet size is determined by the maximum number of hosts per physical subnet. Variable length subnets make it possible to engineer a plan for subnet addressing and routing where the size of an IP subnet is related to the actual number of hosts on the subnetwork [15].

Alternatively, the IP routing model for subnets can be extended by grouping a set of connected physical subnets into an *area*. Associated with an area is an IP address prefix that is common to addresses of all the hosts within the area. When outside of an area, routing to hosts within the area is done based on the IP address prefix associated with the area. When inside of the area, routing to hosts within the area is based on routes to individual hosts. Existing intradomain routing protocols are capable of supporting a large number of host routes within an area, so the historical necessity of reducing routing load by routing by IP subnets may no longer hold [9]. Routing and addressing by area also simplifies the problem of

14

host configuration, since a host could be moved between any of the physical subnets within an area and retain the same address.

The two techniques described in this section, namely, variable length subnetting and routing by areas, may be either used independently or can be combined. Application of these techniques will help to improve and maximize the utilization of IP address space.

## Conclusion

The Internet routing system must change to scale to the size of the Internet in the next few years. Changing the interdomain routing system to use IP address prefixes instead of IP network addresses makes it possible to scale the routing system by the number of providers instead of the number of subscribers. Current generation internet routing protocols, BGP-4, OSPF, RIP-2, and IS-IS, are capable of supporting Classless Interdomain Routing provided IP addresses are assigned in a manner that codes a site's position in the routing topology. Changing host addresses into blocks of addresses, topologically related to interdomain routing is needed to drive routing overhead to minimum configurations when sites switch providers.

Techniques proposed in this article will significantly reduce the rate of IP address consumption, which is currently very high because of both technical and administrative reasons. This strategy will preserve investment in Internet technology by maximizing the utility of IP version 4. It will also provide sufficient time for alternative proposals (as detailed in other articles in this issue) to develop and mature to a level suitable for deployment in an operational infrastructure.

A challenge in the deployment of CIDR and the use of renumbering is that it is a significant change to the existing practice of getting a network address and keeping it. Many network and computer system administrators will need to make local changes for the benefit of the global Internet without any apparent short-term gain for their local site. Some people may question why they should bear the cost of expanded growth of the Internet. They will ask to see cost/benefit or risk/reward analyses to understand why they should participate in cooperative behavior with respect to a global routing and addressing plan. The answer to these questions is to observe that there are direct long-term benefits for a site to renumber its hosts. While renumbering is often not simple, the complexity and cost of renumbering needs to be evaluated in light of other alternatives. The alternatives involve, among other things, installing new network and applications software, training staff to operate and manage new protocols, and dealing with software that is not as mature as the implementations of the current IP suite. Based on our operational experience with today's global Internet, and its evolution over the last several years, we believe that the solutions proposed in this article are the most cost-effective and of the lowest risk.

Today the Internet has 1.5 million hosts. By using CIDR and assigning IP address space accordingly, it should be possible to have at least 10 percent of the total IP address space used by

systems connected to the Internet. This will allow the Internet to grow to at least 400 million systems. Therefore, even if the Internet doubles in size each year, it should be possible to address and route the current version of IP into the next century.

## Acknowledgments

We would like to thank Tony Li (cisco Systems) and Jon Crowcroft (University College London) for comments on this article. The anonymous reviewers significantly enhanced the logic and presentation of the material. Mr. Ford acknowledges support from the U.S. Department of Energy's Office of Energy Research (Contract No. KC0702) and Los Alamos National Laboratory (Contract No. W-7405-ENG-36). The authors acknowledge support from the National Science Foundation

## References

[1] G. Almes, P. Ford, and P. Lothberg, "Draft Proposal for Global Internet Connectivity," Intercontinental Engineering Planning Group (IEPG) Meeting Working Document, Kobe, Japan, June 1992.
[2] R. W. Collins, "Use of OSI IS-IS for Routing in TCP/IP and Dual Environments," RFC 1195, Dec. 1990.
[3] R. Colella and R. Gobin, "Guidelines for OSI NSAP Allocation in the Internet," RFC 1237, July 1991.
[4] V. Fuller, et al., "Supernetting: An Address Assignment and Aggregation Strategy," RFC 1338, June 1992.
[5] E. P. Gerich, "Guidelines for Management of IP Address Space," RFC 1366, Oct. 1992.
[6] S. Hares and D. Katz, "Administrative Domains and Routing Domains: A Model for Routing in the Internet," RFC 1136, Dec. 1989.
[7] C. L. Hedrick, "Routing Information Protocol," RFC 1058, June 1988.
[8] C. L. Hedrick, "An Introduction to IGRP," File on ftp.cisco.com, Aug. 1991.
[9] ISO, "Intermediate System to Intermediate System Intra-Domain Routing Information Exchange Protocol for Use in Conjunction with the Protocol for Providing the Connectionless-mode Network Service (ISO 8473)," ISO/IEC 10589, 1992.
[10] L. Kleinrock and K. Farouk, "Hierarchical Routing for Large Networks," Computer Networks 1 (North-Holland Publishing Company 1977).
[11] M. Lottor, "Internet Growth (1981–1991)," RFC 1296, Jan. 1992.
[12] K. Lougheed, ed., and Y. Rekhter, "A Border Gateway Protocol 3 (BGP-3)," RFC 1267, Oct. 1991.
[13] G. Malkin, "RIP Version 2 — Carrying Additional Information," RFC 1388, Jan. 1993.
[14] P. V. Mockapetris, "Domain Names—Implementation and Specification," RFC 1035, Nov. 1987.
[15] J. Moy, "OSPF Version 2," RFC 1247, July 1991.
[16] J. B. Postel, "User Datagram Protocol," RFC 768, Aug. 1980.
[17] J. B. Postel, "Internet Protocol," RFC 791, Sept. 1981.
[18] J. B. Postel, "Transmission Control Protocol," RFC 793, Sept. 1981
[19] Y. Rekhter, ed., and T. Li, "A Border Gateway Protocol (BGP-4)," Internet Draft (will become an Internet RFC), Dec. 1992.
[20] Y. Rekhter and T. Li, "An Architecture for IP Address Allocation with CIDR," Internet Draft (will become an Internet RFC), Feb. 1993.
[21] E. C. Rosen, "Exterior Gateway Protocol (EGP)," RFC 827, Oct. 1982.

## Biographies

PETER S. FORD received a B.G.S. from the University of Michigan. He is a member of the technical staff at Los Alamos National Laboratory, Los Alamos, New Mexico. His work is focused on the evolution of the Internet. He has worked on networks and operating systems for the University of Utah, Bitnet-Line, and the Industrial Technology Institute at the University of Michigan.

YAKOV REKHTER has an M.S. from St. Petersburg University, Russia, and M.S. and Ph.D. degrees in computer science from New York University and Polytechnic University, respectively. He has been with IBM since 1984, and is currently a research staff member and a manager of the high performance communication group at T. J. Watson Research Center, Yorktown Heights, New York. He was one of the leading architects, as well as the major software developer, of the NSFNET Backbone Phase II. His present activities include work on CIDR, the unified approach to interdomain routing, supporting of host mobility and support of IP over Fibre Channel subnetworks.

HANS-WERNER BRAUN received a Diploma in Engineering in 1978 in West Germany, and worked for several years at the Regional Computing Center of the University of Cologne on network engineering. He joined the San Diego Supercomputer Center (SDSC), San Diego, California, as a principal scientist in 1991, focusing on NSF funded efforts for NREN engineering and a few of performance related research. His prior activities include work as a principal investigator on the NSFNET backbone project while working at Merit, Inc., in Michigan.

*****

A challenge in the deployment of CIDR and the use of renumbering is that it is a significant change to the existing practice of getting a network address and keeping it.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/633 754 | 08/07/2000 | Abdullah Ali Bahattab | 1 | 3383 |

22897     7590     12/18/2003
DEMONT & BREYER, LLC
SUITE 250
100 COMMONS WAY
HOLMDEL, NJ  07733

| EXAMINER |
|---|
| SCHULTZ  WILLIAM C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2664 | |

DATE MAILED: 12/18/2003

3

Please find below and/or attached an Office communication concerning this application or proceeding

PTO-90C (Rev 10/03)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/633,754 | BAHATTAB ABDULLAH ALI |
| | Examiner | Art Unit |
| | William C. Schultz | 2664 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>07 August 2000</u>.

2a)☐ This action is **FINAL**.     2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
   closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-4</u> is/are pending in the application.

   4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1 and 3</u> is/are rejected.

7)☒ Claim(s) <u>2 and 4</u> is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>07 August 2000</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. §§ 119 and 120**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   a)☐ All  b)☐ Some * c)☐ None of:

   1 ☐ Certified copies of the priority documents have been received.

   2 ☐ Certified copies of the priority documents have been received in Application No. _____.

   3 ☐ Copies of the certified copies of the priority documents have been received in this National Stage
      application from the International Bureau (PCT Rule 17.2(a)).

   * See the attached detailed Office action for a list of the certified copies not received.

13)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application)
   since a specific reference was included in the first sentence of the specification or in an Application Data Sheet.
   37 CFR 1.78.

   a) ☐ The translation of the foreign language provisional application has been received.

14)☒ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121 since a specific
   reference was included in the first sentence of the specification or in an Application Data Sheet. 37 CFR 1.78.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) _____

4) ☐ Interview Summary (PTO-413) Paper No(s). _____

5) ☐ Notice of Informal Patent Application (PTO-152)

6) ☐ Other: _____

U.S. Patent and Trademark Office
PTOL-326 (Rev. 11-03)                    Office Action Summary                    Part of Paper No. 3

## DETAILED ACTION

### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless --
>
> (e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent

The changes made to 35 U.S.C. 102(e) by the American Inventors Protection Act

of 1999 (AIPA) and the Intellectual Property and High Technology Technical

Amendments Act of 2002 do not apply when the reference is a U.S. patent resulting

directly or indirectly from an international application filed before November 29, 2000.

Therefore, the prior art date of the reference is determined under 35 U.S.C. 102(e) prior

to the amendment by the AIPA (pre-AIPA 35 U.S.C. 102(e)).

Claims 1,3 are rejected under 35 U.S.C. 102(e) as being anticipated by Zaumen

et al. [U.S. Pat. 6,118,760].

Regarding claim 1, Zaumen et al. discloses a router comprising:

an input port for receiving a succession of packets, wherein each of said packets

comprises a destination address; **(fig. 1, part 110; col. 4, line 68 – col. 5, line 5; col.**

**5, lines 40-44)**

a plurality of output ports; **(fig. 1, parts 120 and on)**

a switching fabric for interconnecting said input port to each of said plurality of

output ports; **(fig. 1, part 141; col. 5, lines 16-18)**

Application/Control Number: 09/633,754                                 Page 3
Art Unit: 2664

a processor for building a temporal model (col. 8, lines 21-28 – a timer is a temporal model) of the occurrence of said destination addresses at said input port, (fig. 1, part 130; col. 5, lines 18-21; col. 5, lines 46-48 – packets contain headers which are evaluated against entries in a forwarding memory; col. 6, lines 2-6 – discloses flow entries include destination addresses obtained from packets; col. 8, lines 8-11 – entry is created; col. 8, lines 18-20 – associated with the entry is a aged destination field) for populating said routing table cache based on said temporal model and at least one entry that is stored in a routing table (col. 8, lines 8-11 – entry is created; col. 8, lines 18-20 – associated with the entry is a aged destination field), and for routing at least one of said packets from said input port to one of said output ports through said switching fabric based on said entry that is stored in said routing table cache. (col. 7 ,lines 39-44 – packets are forwarded that match an entry in the table)

Regarding claim 3, Zaumen et al. discloses a method comprising:

receiving a temporal succession of packets at an input port, wherein each of said packets comprises a destination address; (fig. 1, part 110; col. 4, line 68 – col. 5, line 5; col. 5, lines 40-44)

generating a temporal model (col. 8, lines 21-28 – a timer is a temporal model) based on the occurrence of said destination addresses; (col. 5, lines 18-21; col. 5, lines 46-48 – packets contain headers which are evaluated against entries in a forwarding memory; col. 6, lines 2-6 – discloses flow entries include destination

Application/Control Number: 09/633,754                Page 4
Art Unit: 2664

addresses obtained from packets; col. 8, lines 8-11 – entry is created; col. 8, lines

18-20 – associated with the entry is a aged destination field)

    populating a routing table cache based on said temporal model and at least one

entry that is stored in a routing table; and table (col. 8, lines 8-11 – entry is created;

col. 8, lines 18-20 – associated with the entry is a aged destination field)

    forwarding at least one of said packets from said input port to one of a plurality of

output ports based on said entry that is stored in said routing table cache. (col. 7 ,lines

39-44 – packets are forwarded that match an entry in the table)


### Allowable Subject Matter

    Claims 2,4 are objected to as being dependent upon a rejected base claim, but

would be allowable if rewritten in independent form including all of the limitations of the

base claim and any intervening claims.

### Conclusion

    Any inquiry concerning this communication or earlier communications from the

examiner should be directed to William C. Schultz whose telephone number is 703-305-

2367. The examiner can normally be reached on M-F(7-4)(first bi-week) M-Th(7-

4)(second bi-week).

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Wellington Chin can be reached on 703-305-4366. The fax phone number

for the organization where this application or proceeding is assigned is 703-872-9314.

Application/Control Number: 09/633,754                    Page 5
Art Unit: 2664

Any inquiry of a general nature or relating to the status of this application or

proceeding should be directed to the receptionist whose telephone number is 703-305-

3900.


William Schultz
December 11, 2003

WELLINGTON CHIN
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 2600

| | | Application/Control No | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| **Notice of References Cited** | | 09/633 754 | BAHATTAB, ABDULLAH ALI |
| | | Examiner | Art Unit | Page 1 of 1 |
| | | William C Schultz | 2664 | |

## U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-6,118,760 | 09-2000 | Zaumen et al. | 370/229 |
| | B | US-5,488,608 | 01-1996 | Flammer, III, George H. | 370/400 |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

## FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

## NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates  Classifications may be US or foreign

U.S. Patent and Trademark Office
PTO-892 (Rev 01-2001)                    Notice of References Cited                    Part of Paper No  3



| L Number | Hits | Search Text | DB | Time stamp |
|---|---|---|---|---|
| 1 | 2832 | routing near table | USPAT; EPO; JPO | 2003/12/11 13:17 |
| 2 | 2101 | (routing near table ) and receiving | USPAI; EPO; JPO | 2003/12/11 13:17 |
| 3 | 830 | (routing near table ) and (receiving same time) | USPAI; EPO; JPO | 2003/12/11 13:18 |
| 4 | 230 | (routing near table ) and (receiving same time same destination) | USPAI; EPO; JPO | 2003/12/11 13:18 |
| 5 | 118 | ((routing near table ) and (receiving same time same destination)) and forwarding | USPAI; EPO; JPO | 2003/12/11 13:19 |
| 6 | 90 | (((routing near table ) and (receiving same time same destination)) and forwarding) and 370/$.ccls. | USPAI; EPO; JPO | 2003/12/11 13:19 |
| - | 13 | routing near table near cache | USPAI; EPO; JPO | 2003/12/10 13:44 |
| - | 11 | (routing near table near cache) and entry | USPAI; EPO; JPO | 2003/12/09 11:30 |
| - | 9 | ((routing near table near cache) and entry) and time | USPAI; EPO; JPO | 2003/12/09 15:34 |
| - | 255 | ((routing near table) and entry) and (correlation or correlate$1) | USPAI; EPO; JPO | 2003/12/09 15:35 |
| - | 0 | (((routing near table) and entry) and (correlation or correlate$1)) and (moving near average) | USPAI; EPO; JPO | 2003/12/09 15:35 |
| - | 1 | ((routing near table) and entry) and (moving near average) | USPAI; EPO; JPO | 2003/12/09 15:35 |
| - | 2832 | routing near table | USPAI; EPO; JPO | 2003/12/11 13:16 |

Serial No 09/633754

Attorney Docket: 520-001US



**I N   T H E   U N I T E D   S T A T E S**
**P A T E N T   A N D   T R A D E M A R K   O F F I C E**

**Patent Application**

| | |
|---|---|
| **Inventor:** | Abdullah Ali Bahattab |
| **Serial No.:** | 09/633754 |
| **Filing Date:** | 8/7/2000 |
| **Art Unit:** | 2664 |
| **Examiner:** | William C. Schultz |
| **Docket No.:** | 520-001US |
| **Title:** | Predictive Routing Table Cache Population |

Certificate of Mailing

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on 29 January 2004

Name of person signing this certificate: Carole Kalman.

Signature _____

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

**RECEIVED**

FEB 0 6 2004

Technology Center 2600

**A M E N D M E N T**

- 1 -

Serial No. 09/633754                                    Attorney Docket: 520-001US

The following claims are presented for examination:

**Claim 1 (currently amended):**  A router comprising:

an input port for receiving a succession of packets, wherein each of said packets comprises a destination address;

a plurality of output ports;

a switching fabric for interconnecting said input port to each of said plurality of output ports; and

a processor ~~or~~ for building a temporal model of the occurrence of said destination addresses at said input port, for populating said routing table cache based on said temporal model and at least one entry that is stored in a routing table, and for routing at least one of said packets from said input port to one of said output ports through said switching fabric based on said entry that is stored in said routing table cache;

wherein said temporal model is based on the autoregressive moving average of the occurrence of said destination addresses.

**Claim 2 (canceled)**

**Claim 3 (currently amended):**  A method comprising:

receiving a temporal succession of packets at an input port, wherein each of said packets comprises a destination address;

generating a temporal model based on the occurrence of said destination addresses;

populating a routing table cache based on said temporal model and at least one entry that is stored in a routing table; and

forwarding at least one of said packets from said input port to one of a plurality of output ports based on said entry that is stored in said routing table cache;

wherein said temporal model is based on the autoregressive moving average of the occurrence of said destination addresses.

**Claim 4 (canceled)**

- 2 -

14

A

Serial No  09/633754                                  Attorney Docket: 520-001US

## R E M A R K S

       Claims 1 through 4 were presented for examination.  Claims 1 and 3 were rejected.
Claims 2 and 4 were objected to.

       Claims 1 and 3 have been amended to clarify the distinction between the present
invention and the prior art.  Claim 1 has been also amended to correct inadvertent
typographical errors

       Claims 2 and 4 been canceled, and the limitations in those claims have been
incorporated into claims 1 and 3, respectively, to bring the claims into an allowable state.

       The applicant respectfully requests reconsideration in light of the amendments and
the following comments.

### 35 U.S.C. 102 Rejection of Claims 1 and 3

       Claims 1 and 3 were rejected under 35 U.S.C. 102(e) as being anticipated by W. T.
Zaumen et al., U.S. Patent 6,118 760, issued September 12, 2000 (hereinafter "Zaumen")
The applicant respectfully submits that the claims, as amended, overcome the rejection.

       Claim 1, as amended, recites:

---

    **1.** A router comprising:

      an input port for receiving a succession of packets, wherein each of
said packets comprises a destination address;

      a plurality of output ports;

      a switching fabric for interconnecting said input port to each of said
plurality of output ports; and

      a processor for building a temporal model of the occurrence of said
destination addresses at said input port, for populating said routing table
cache based on said temporal model and at least one entry that is stored in a
routing table, and for routing at least one of said packets from said input port
to one of said output ports through said switching fabric based on said entry
that is stored in said routing table cache;

      *wherein said temporal model is based on the autoregressive moving
average of the occurrence of said destination addresses*

    [*emphasis supplied*]

---

       Nowhere does Zaumen teach or suggest, alone or in combination with the other
references, what claim 1 recites – namely that the temporal model is based on the
autoregressive moving average of the occurrence of the destination addresses.  For this
reason, the applicant respectfully submits that the rejection of claim 1 is overcome.

- 3 -

$A$

Serial No. 09/633754                          Attorney Docket: 520-001US

Claim 3, as amended, recites:

---

**3.** A method comprising:

receiving a temporal succession of packets at an input port, wherein each of said packets comprises a destination address;

generating a temporal model based on the occurrence of said destination addresses;

populating a routing table cache based on said temporal model and at least one entry that is stored in a routing table; and

forwarding at least one of said packets from said input port to one of a plurality of output ports based on said entry that is stored in said routing table cache;

*wherein said temporal model is based on the autoregressive moving average of the occurrence of said destination addresses.*

[*emphasis supplied*]

---

Nowhere does Zaumen teach or suggest, alone or in combination with the other references, what claim 3 recites – namely that the temporal model is based on the autoregressive moving average of the occurrence of the destination addresses. For this reason, the applicant respectfully submits that the rejection of claim 3 is overcome.

**<u>Allowable Subject Matter</u>**

Claims 2 through 4 were objected to as being dependent upon rejected base claims. The limitations in claims 2 and 4 have been incorporated into claims 1 and 3, respectively, placing claims 1 and 3 in an allowable state.

**<u>Request for Reconsideration Pursuant to 37 C.F.R. 1.111</u>**

Having responded to each and every ground for objection and rejection in the Office action mailed December 18, 2003, the applicant requests reconsideration of the instant application pursuant to 37 CFR 1.111 and requests that the Examiner allow all of the pending claims and pass the application to issue.

Should there remain unresolved issues the applicant respectfully requests that Examiner telephone the applicant's attorney at 732-578-0103 x11 so that those issues can be resolved as quickly as possible.

Respectfully,
DeMont & Breyer, LLC

By _____
Wayne S. Breyer

- 4 -

A

Serial No. 09/633754

Attorney Docket: 520-001US

Reg. No. 38,089
Attorney for Applicants
732-578-0103 x12

Date _____1/29/04_____

DeMont & Breyer, L L C
Suite 250
100 Commons Way
Holmdel, NJ  07733
United States of America

- 5 -

A

Serial No 09/633754

Attorney Docket: 520-001US

*2664*



# IN THE UNITED STATES
# PATENT AND TRADEMARK OFFICE

**Patent Application**

| | |
|---|---|
| **Inventor:** | Abdullah Ali Bahattab |
| **Serial No.:** | 09/633754 |
| **Filing Date:** | 8/7/2000 |
| **Art Unit:** | 2664 |
| **Examiner:** | William C Schultz |
| **Docket No.:** | 520-001US |
| **Title:** | Predictive Routing Table Cache Population |

_Certificate of Mailing_

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on 29 January 2004

Name of person signing this certificate: Carole Kalman.

Signature _____

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

**RECEIVED**

FEB 0 6 2004

Technology Center 2600

Enclosed are the following papers related to the above-identified patent application:

1. Transmittal Letter with Certificate of Mailing – 1 Page (1x)
2. Amendment with Certificate of Mailing – 5 Pages (1x)

Pursuant to 37 CFR 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as incorporating a petition for extension of time for the appropriate length of time.

Respectfully,
DeMont & Breyer, LLC

By _____
Wayne S. Breyer
Reg. No. 38,089
Attorney for Applicants
732-578-0103 x12

Date _1/29/04_

DeMont & Breyer, L.L.C.
Suite 250
100 Commons Way
Holmdel, NJ 07733
United States of America

- 1 -

| *Notice of Allowability* | Application No. | Applicant(s) |
| --- | --- | --- |
| | 09/633,754 | BAHATTAB, ABDULLAH ALI |
| | Examiner | Art Unit | |
| | William C. Schultz | 2664 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1 313 and MPEP 1308

1 ☒ This communication is responsive to *2/2/2004*

2 ☒ The allowed claim(s) is/are *1,3 renumbered as 1,2 respectively*

3 ☒ The drawings filed on *8/7/2000* are accepted by the Examiner

                                                                      Ajit Patel
                                                                    Primary Examiner

4 ☐ Acknowledgment is made of a claim for foreign priority under 35 U S C § 119(a)-(d) or (f)
    a) ☐ All    b) ☐ Some*    c) ☐ None    of the:
        1 ☐ Certified copies of the priority documents have been received
        2 ☐ Certified copies of the priority documents have been received in Application No _____
        3 ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the
            International Bureau (PCT Rule 17 2(a))

    * Certified copies not received: _____

Applicant has THREE MONTHS FROM THE 'MAILING DATE' of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE**

5 ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF
    INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient

6 ☐ CORRECTED DRAWINGS ( as 'replacement sheets') must be submitted
    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
        1) ☐ hereto or 2) ☐ to Paper No /Mail Date _____
    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
        Paper No /Mail Date _____
    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of
    each sheet Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1 121(d).**

7 ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the
    attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL

Attachment(s)
| | |
| --- | --- |
| ☐ Notice of References Cited (PTO-892) | 5 ☐ Notice of Informal Patent Application (PTO-152) |
| ☐ Notice of Draftperson's Patent Drawing Review (PTO-948) | 6 ☐ Interview Summary (PTO-413). |
| |     Paper No./Mail Date _____ . |
| ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08). | 7 ☐ Examiner's Amendment/Comment |
|     Paper No./Mail Date _____ | |
| ☐ Examiner's Comment Regarding Requirement for Deposit | 8 ☐ Examiner's Statement of Reasons for Allowance |
|     of Biological Material | 9 ☐ Other _____ |

U.S. Patent and Trademark Office
PTOL-37 (Rev 1-04)                  **Notice of Allowability**                  Part of Paper No./Mail Date



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## NOTICE OF ALLOWANCE AND FEE(S) DUE

| 22897 | 7590 | 04/29/2004 |
|---|---|---|

DEMONT & BREYER, LLC
SUITE 250
100 COMMONS WAY
HOLMDEL, NJ 07733

| EXAMINER |
|---|
| SCHULTZ, WILLIAM C |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2664 | |

DATE MAILED: 04/29/2004

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/633,754 | 08/07/2000 | Abdullah Ali Bahattab | 1 | 3383 |

TITLE OF INVENTION: PREDICTIVE ROUTING TABLE CACHE POPULATION

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $665 | $0 | $665 | 07/29/2004 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (OR AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS ABANDONED.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status is changed, pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above and notify the United States Patent and Trademark Office of the change in status, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check the box below and enclose the PUBLICATION FEE and 1/2 the ISSUE FEE shown above.

☐ Applicant claims SMALL ENTITY status.
See 37 CFR 1.27

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 11/03) Approved for use through 04/30/2004

PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), to: **Mail**      Mail Stop ISSUE FEE
                                                                                 Commissioner for Patents
                                                                                 P.O. Box 1450
                                                                                 Alexandria, Virginia 22313-1450
                                                                    or **Fax**    (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

| 22897 | 7590 | 04/29/2004 |

DEMONI & BREYER, LLC
SUITE 250
100 COMMONS WAY
HOLMDEL, NJ 07733

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

|  |
|---|
| (Depositor's name) |
| (Signature) |
| (Date) |

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/633,754 | 08/07/2000 | Abdullah Ali Bahattab | 1 | 3383 |

TITLE OF INVENTION: PREDICTIVE ROUTING TABLE CACHE POPULATION

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $665 | $0 | $665 | 07/29/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SCHULTZ, WILLIAM C | 2664 | 370-232000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3  ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.
(A) NAME OF ASSIGNEE                                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent);   ☐ individual   ☐ corporation or other private group entity   ☐ government

4a. The following fee(s) are enclosed:                    4b. Payment of Fee(s):
☐ Issue Fee                                               ☐ A check in the amount of the fee(s) is enclosed.
☐ Publication Fee                                         ☐ Payment by credit card. Form PTO-2038 is attached
☐ Advance Order - # of Copies _____                    ☐ The Director is hereby authorized to charge the required fee(s), or credit any overpayment to Deposit Account Number _____ (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

_____     _____
(Authorized Signature)                  (Date)

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

TRANSMIT THIS FORM WITH FEE(S)

PTOL-85 (Rev. 11/03) Approved for use through 04/30/2004        OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/633,754 | 08/07/2000 | Abdullah Ali Bahattab | 1 | 3383 |

| | | | EXAMINER |
|---|---|---|---|
| 22897 | 7590 | 04/29/2004 | SCHULTZ, WILLIAM C |
| DEMONT & BREYER, LLC | | | |
| SUITE 250 | | | |
| 100 COMMONS WAY | | ART UNIT | PAPER NUMBER |
| HOLMDEL, NJ 07733 | | 2664 | |

DATE MAILED: 04/29/2004

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 802 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 802 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) system (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (703) 305-1383. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

Page 3 of 3

PTOL-85 (Rev 11/03) Approved for use through 04/30/2004

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), to: **Mail**

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or **Fax**   (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

22897     7590     04/29/2004

DEMONT & BREYER, LLC
SUITE 250
100 COMMONS WAY
HOLMDEL, NJ 07733



Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

Kelly Kline    (Depositor's name)

_Kelly_    (Signature)

May 25, 2004    (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/633,754 | 03/07/2000 | Abdullah Ali Bahastab | 1 | 3383 |

TITLE OF INVENTION: PREDICTIVE ROUTING TABLE CACHE POPULATION

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $665 | $0 | $665 | 07/29/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SCHULTZ, WILLIAM C | 2664 | 370-232000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1   DeMont & Breyer, LLC
2
3

3 ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE     (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent):   ☐ individual   ☐ corporation or other private group entity   ☐ government

4a. The following fee(s) are enclosed:

☒ Issue Fee
☐ Publication Fee
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.
☒ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized by charge the required fee(s), or credit any overpayment to Deposit Account Number _____ (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

(Authorized Signature)     (Date)

Jason Paul DeMont (reg. 35793) May 25, 2004

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

06/01/2004 WABRHAH2 00000102 09633754

01 FC:2501                    665.00 OP

TRANSMIT THIS FORM WITH FEE(S)

PTOL-85 (Rev 11/03) Approved for use through 04/30/2004      OMB 0651-0033      U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective December 29, 1999

Application or Docket Number
63379

## CLAIMS AS FILED - PART I

| FOR | (Column 1) NUMBER FILED | (Column 2) NUMBER EXTRA | SMALL ENTITY TYPE ☐ | RATE | FEE | OR | OTHER THAN SMALL ENTITY RATE | FEE |
|---|---|---|---|---|---|---|---|---|
| BASIC FEE | | | | | 345.00 | OR | | 690.00 |
| TOTAL CLAIMS | 4 | minus 20= | 1 | X$ 9= | | OR | X$18= | |
| INDEPENDENT CLAIMS | 2 | minus 3= | | X39= | | OR | X78= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | | +130= | ✓ | OR | +260= | |
| | | | | TOTAL | | OR | TOTAL | |

\* If the difference in column 1 is less than zero, enter "0" in column 2

## CLAIMS AS AMENDED - PART II

| AMENDMENT A | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY RATE | ADDITIONAL FEE | OR | OTHER THAN SMALL ENTITY RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| Total | 2 | Minus 20 | = | X$ 9= | | OR | X$18= | |
| Independent | 2 | Minus 3 | = | X39= | | OR | X78= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +130= | | OR | +260= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

| AMENDMENT B | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| Total | | Minus | = | X$ 9= | | OR | X$18= | |
| Independent | | Minus | = | X39= | | OR | X78= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +130= | | OR | +260= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

| AMENDMENT C | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|
| Total | | Minus | = | X$ 9= | | OR | X$18= | |
| Independent | | Minus | = | X39= | | OR | X78= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | +130= | | OR | +260= | |
| | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev. 12/99)

Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                               Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II</u>**

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

     Plaintiff,

v.                            Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

     Defendant.

_____/

### SUPPLEMENTAL DECLARATION OF BOHDAN BODNAR

1.     I am an adult resident of Park Ridge, Illinois.

2.     I have personal knowledge of the facts stated herein.

3.     I work for Lemko Corporation.

4.     I have never been contacted by Juniper, or anyone representing Juniper, regarding this lawsuit or my role in the invention disclosed in U.S. Patent No. 6, 816, 457.

5.     It is common practice for a student to use the plural pronouns when writing a thesis paper even though only he or she is the only person doing the research.

6.     It is common and accepted practice to list thesis co-advisors on the thesis and related papers even if they contribute little to the papers.

7.     Near the end of 1999, I deemed Dr. Bahattab's research work to be fundamentally completed and suggested he terminate the research and document it in a thesis and conference paper.

8.     I was one of the founders of the Advanced Simulation Technologies Conference. The reviewers and I were volunteers and not compensated in any way. Thus, we were free to set reviewing standards as we deemed fit. My guidelines were that (a) the work is to be novel (b)

not published elsewhere (c) directly applicable to industry telecom-related issues (d) accessible to the general audience and (e) the paper was accepted for publication only if the majority of the reviewers agreed to accept it. In the event the two reviewers disagreed with each other, a third reviewer or I would review the paper and make the final decision.

9.      Dr. Bahattab's conference paper for ATS2000 was accepted solely on the basis of merit. Furthermore, the conference paper, being essentially a condensation of his thesis, reflected his independent research. At no time were the reviewers instructed to accept the paper because Dr. Bahattab was my student.

10.     Dr. Bahattab put my name first on the paper entitled "Predicting IP addresses to speed up routing lookup" for the 2000 Advanced Simulation Technologies Conference during April 16-20, 2000, because Lucent required that, in the case of a joint paper with non-Lucent people, the name(s) of the Lucent (co)authors be listed FIRST. I was employed by Lucent when this paper was published. My contribution to this conference paper consisted of clarifying the material and making it accessible to the general audience.

11.     Subsequent conference papers that Abdullah wrote during 2000 and later had identical contributions from me.

12.     In the 2002 article entitled "Producing a High Hit Ration and Low Search Time, in Forwarding Routing Tables by Predicting IP Addresses", there is a footnote regarding the work being done while I was at Lucent. I was acting as Dr. Bahattab's thesis co-advisor at the time he was writing his thesis and the ATS2000 paper. The 2000 and 2002 papers are very similar, but by 2002 I had left Lucent, so I believe Dr. Bahattab added that footnote for clarification.

2

I declare, under penalty of perjury, that the foregoing is true and correct.

_Bohdan Bodnar_

Bohdan Bodnar

Executed on: 5/19/2008

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.

                                Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II</u>**

# EXHIBIT 3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

    Plaintiff,

v.                            Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

    Defendant.

_____/

## DECLARATION OF ABDULLAH ALI BAHATTAB

1.    I am an adult resident of Saudi Arabia.

2.    I have personal knowledge of the facts stated herein.

3.    In 1999, I was a doctoral candidate in computer science at the Illinois Institute of Technology in Chicago.

4.    My thesis committee consisted of my advisors Dr. Martha Evens, a Research Professor of Computer Science at the Department of Computer Sciences at the Illinois Institute of Technology, Dr. Bodhan Bodnar, and then an employee at Lucent Technologies, and Dr. George Kraft, an Associate Professor of Information Systems for the Illinois Institute of Technology Stuart Graduate School of Business.

5.    Dr. Evens was my lead advisor who was in charge of the language and format of my thesis paper. She was the main advisor at the department that is why her signature appears first on my thesis.

6.    Dr. Bodnar was the lead technical thesis advisor for my thesis committee.

7.    Dr. Kraft was the administrative advisor for my thesis committee with whom I had weekly meetings for the format of my thesis paper.

8.    Dr. Kraft recommended that I publish a paper on the topic of my thesis before I graduated.

9.    Dr. Evens advised me to use plural pronouns in my thesis and my scientific papers.

10.    I am the sole inventor of the invention disclosed in both U.S. Provisional Application No. 60/208,888, filed June 2, 2000 and U.S. Patent No. 6, 816,457, issued November 9, 2004.

11.    I personally presented my paper "Predicting IP addresses to speed up routing lookup" in Washington, DC at the AST 2000 Conference and my paper "Producing a High Hit Ratio and Low Search Time In Forwarding Routing Tables by Predicting IP Addresses" at the IEEE GLOBECOM 2002 Conference in Taiwan.

12.    Dr. Bodnar was listed as the first author on the AST 2000 Conference paper entitled "Predicting IP addresses to speed up routing lookup" to abide by Lucent's requirement that in papers co-authored by Lucent and non-Lucent employees, the Lucent employee's name must appear first.    There is no other meaning to the order of the authors.

13.    The papers I presented and which were published at the seminars were condensed version of my thesis and contained no material that was not contained in my thesis.

14.    The document submitted with my Provisional Patent Application No. 60/208,888, filed June 2, 2000, was the existing draft of my thesis paper at the time.

2

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

_____
Abdullah Ali Bahattab

Executed on: _____    May 22, 2008

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                                  Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM**
**IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II**

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                                                    Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

### DECLARATION OF BOHDAN BODNAR

    1.     I am an adult resident of Park Ridge, Illinois.

    2.     I have personal knowledge of the facts stated herein.

    3.     I work for Lemko Corporation.

    4.     I was the lead technical thesis advisor of Dr. Abdullah Ali Bahattab's thesis committee, which included Dr. Martha W. Evens and Dr. George Kraft.

    5.     The entire intellectual property involved in U.S. Patent No. 6,816,457, "Predictive Routing Table Cache Population," dated November 9, 2004, belongs solely to Dr. Bahattab.

    6.     The methodology developed in Dr. Bahattab's Ph.D. thesis and the work he presented at the conferences and presented when writing the patent filing were the independent work of Dr. Bahattab.

    7.     Dr. Bahattab's thesis was novel and original.

    8.     I merely provided bounds on Dr. Bahattab's thesis work, provided an industry-oriented critique of the work, and ensured the work was completed on time.

9.      My contribution to the conference papers was to correct grammatical errors, suggest rewriting the introduction to make the material more accessible to a general audience and to ensure the paper was critiqued by appropriate reviewers.

10.      The help provided by the members of the thesis committee was of the kind ordinarily provided by the committee.

11.      I have read the Complaint filed by Juniper Networks, Inc. in this case.

12.      The statements made by Juniper Networks, Inc. that Dr. Bahattab misled the U.S. Patent Office by not disclosing co-inventors are not correct.

13.      I am not a co-inventor on U.S. Patent No. 6,816,457, "Predictive Routing Table Cache Population," dated November 9, 2004.


I declare, under penalty of perjury, that the foregoing is true and correct.


_Bohdan Bodnar_

Bohdan Bodnar


Executed on: _MAY- 14 - 2008_

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                                                    Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM**
**IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II**

# EXHIBIT 5

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

     Plaintiff,

v.                                                                    Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

     Defendant.

_____/

## DECLARATION OF MARTHA W. EVENS

1.    I am an adult resident of Evanston, Illinois.

2.    I have personal knowledge of the facts stated herein.

3.    I am a Research Professor of Computer Science in the Department of Computer Science at the Illinois Institute of Technology.

4.    I was a member of Dr. Abdullah Ali Bahattab's thesis committee, which included Dr. Bohdan Bodnar and Dr. George Kraft.

5.    The entire intellectual property involved in U.S. Patent No. 6,816,457, "Predictive Routing Table Cache Population," dated November 9, 2004, belongs solely to Dr. Bahattab.

6.    The original ideas, the core research work, the derivation of the equations, as well as the prototype implementation were all the independent work of Dr. Bahattab.

7.    Dr. Bahattab himself wrote the original draft of the papers that report this work and he did all of the original work. He included my name, Dr. Bodnar's name and Dr. Kraft's name as a courtesy, because we served as advisors. This is common practice in departments of Computer Science.

8.    I filled out forms and provided some editorial assistance in Dr. Bahattab's writings.

9.    The help provided by the members of the thesis committee was of the kind ordinarily provided by a Ph.D. thesis committee.

10.    I have read the Complaint filed by Juniper Networks, Inc. in this case.

11.    The statements made by Juniper Networks, Inc. that Dr. Bahattab misled the U.S. Patent Office by not disclosing co-inventors are not correct.

12.    I am not a co-inventor on U.S. Patent No. 6,816,457, "Predictive Routing Table Cache Population," dated November 9, 2004.


I declare, under penalty of perjury, that the foregoing is true and correct.


*Marshall Evens*

Martha W. Evens


Executed On: May 15, 2008

.

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                                Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II**

# EXHIBIT 6

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                                     Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DECLARATION OF GEORGE D. KRAFT**

1.     I am an adult resident of Naperville, Illinois.

2.     I have personal knowledge of the facts stated herein.

3.     I am a retired Associate Professor of Information Systems for the Illinois Institute of Technology Stuart Graduate School of Business (IIT-SGSB).

4.     I was the out-of-department advisor of Dr. Abdullah Ali Bahattab's thesis committee, which included Dr. Martha W. Evens and Dr. Bohdan Bodnar.

5.     The entire intellectual property involved in U.S. Patent No. 6,816,457, "Predictive Routing Table Cache Population," dated November 9, 2004, belongs solely to Dr. Bahattab.

6.     Dr. Bahattab's work was highly original and contributed to the body of knowledge of the field.

7.     All the ideas were provided by Dr. Bahattab, and I simply endorsed those I found reasonable and innovative.

8.     My function was solely administrative.

9.    The help provided by the members of the thesis committee was of the kind ordinarily provided by such a committee.

10.    I have read the Complaint filed by Juniper Networks, Inc. in this case.

11.    The statements made by Juniper Networks, Inc. that Dr. Bahattab misled the U.S. Patent Office by not disclosing co-inventors are not correct.

12.    I am not a co-inventor on U.S. Patent No. 6,816,457, "Predictive Routing Table cache Population," dated November 9, 2004.


I declare, under penalty of perjury, that the foregoing is true and correct.


George D. Kraft    3/19/08

George D. Kraft

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

     Plaintiff,

v.                                               Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

     Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II**

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                               Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

## DECLARATION OF COURTNEY G. MEADE

1.      I am an adult resident of Aventura, Florida.

2.      I have personal knowledge of the facts stated herein.

3.      I am an Associate at Ferrell Law.

4.      On March 14, 2008, I sent separate emails to Dr. Evens, Dr. Bodnar and Dr. Kraft with declarations that were formatted for use in federal court.

5.      On March 15, 2008, I received an email from Dr. Bodnar stating that his executed declaration had been mailed to me.

6.      The same day, I received an email from Dr. Evens stating that she had sent me her declaration on March 15, 2008 as well.

7.      On March 18, 2008, I sent an email to Dr. Evens and to Dr. Bodnar stating that I had received their executed declarations that morning.

8.      On March 19, 2008, I received an email from Dr. Kraft stating that he had signed his declaration and would mail it to me.  This matches the date on his declaration.

9.      Based on the information above, it is clear that Dr. Evens and Dr. Bodnar executed their declarations on either March 14, 2008 or March 15, 2008.

I declare, under penalty of perjury, that the foregoing is true and correct.

_Courtney G. Meade_

Executed on: _22 May 2008_

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JUNIPER NETWORKS, INC.,

      Plaintiff,

v.                               Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

      Defendant.

_____/

**DEFENDANT BAHATTAB'S REPLY MEMORANDUM**
**IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT AS TO PART OF COUNT I AND ALL OF COUNT II**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUNIPER NETWORKS, INC.,

     Plaintiff,

v.                                  Case No.: 1:07-cv-01771-PLF

ABDULLAH ALI BAHATTAB,

     Defendant.

_____/

### SUPPLEMENTAL DECLARATION OF MARTHA W. EVENS

1.     I am an adult resident of Evanston, Illinois.

2.     I have personal knowledge of the facts stated herein.

3.     I am a Research Professor of Computer Science in the Department of Computer Science at the Illinois Institute of Technology.

4.     I have never been contacted by Juniper, or anyone representing Juniper, regarding this lawsuit or whether I am a co-inventor of U.S. Patent No. 6,816, 457.

5.     I advised Dr. Bahattab to use the editorial "we" in his thesis and his scientific papers. When I found "I," "me," "my," and "mine," I suggested that he change them to "we," "us," "our," and "ours." The reason I made this recommendation is because this is the usual style for dissertations and papers in engineering, even when the paper has only a single author.

6.     My name appears as co-author on over 340. Some of those I wrote personally. Many others were written by my students and colleagues. Occasionally the ideas were entirely mine, but much of the time the papers arose out of joint work. In other cases, including Dr. Bahattab's, I had no responsibility for the ideas at all. I did proofread his thesis and papers, in my role as his thesis adviser, but my name is listed as a co-author purely as a courtesy.

7.    It is my understanding that when the paper was submitted with Dr. Bodnar listed as the first author, it was done to obtain approval from Dr. Bodnar's employer, and to ensure that the paper would be accepted because he was one of the founders of the symposium.

I declare, under penalty of perjury, that the foregoing is true and correct.


_Martha W. Evens_

Martha W. Evens


Executed On: May 16, 2008